UNITED STATES of America ex rel. Thomas E. KEMP, Petitioner,

v.

Frank J. PATE, Warden, Illinois State Penitentiary, Respondent.

No. 64 C 2000.

United States District Court
N. D. Illinois, E. D.
April 22, 1965.

E. T. Cunningham, Chicago, Ill., for petitioner.

William G. Clark, Atty. Gen. of Illinois, Thomas D. Decker and Philip J. Rock, Asst. Atty. Gen., Chicago, Ill., for respondent.

WILL, District Judge.

Petitioner, Thomas E. Kemp, was convicted in the Criminal Court of Cook County, Illinois of the robbery of Reynold Mitchell and sentenced, on June 26, 1958, to a term of not less than nineteen (19) nor more than twenty (20) years' imprisonment in the Illinois State Penitentiary. The judgment of conviction was affirmed by the Illinois Supreme Court on November 26, 1963, People v. Kemp, 29 Ill.2d 321, 194 N.E.2d 217 (1963).

On December 1, 1964, petitioner filed a petition for a writ of habeas corpus, alleging that the trial court erred in failing to suppress a signed, typewritten confession which petitioner claims was not given voluntarily and which, admittedly, was obtained by the police after some twenty-eight hours of detention. Petitioner contends that his conviction is tainted by the use of such evidence and that his confinement, pursuant to the conviction, is therefore unlawful and in vio-

lation of rights guaranteed him by the Fifth and Fourteenth Amendments to the Constitution.

This contention, and the factual assertions upon which it is based, were presented to the trial court by a motion to suppress and to the Illinois Supreme Court by petition for a writ of error. The trial court, after hearing, denied the motion to suppress without comment. The opinion of the Illinois Supreme Court, cited supra, while noting that the alleged confession was obtained after twenty-eight hours' detention, affirmed the judgment of conviction on the ground that the trial judge—if he believed the testimony of the police officers who testified in opposition to the motion to suppress and contradicted petitioner's testimony—could have concluded that the confession was made voluntarily.

After an initial examination of the instant petition, we ordered respondent to show cause why the petition for a writ of habeas corpus should not be granted, appointed counsel to represent the petitioner and set the matter for a hearing. While the petition contains certain allegations with respect to the prosecutor's closing argument and the "vagueness" of the instructions given to the jury, these issues do not present questions of constitutional consequence. The inquiry of the court, and the evidence and arguments offered by the parties were confined to the relationship between the extended period of detention, the circumstances relating thereto and the voluntariness of petitioner's alleged confession. This is the principal question raised by the instant petition.

The relevant facts are as follows. During the month of May, 1958, the Chicago police received complaints from three delivery truck drivers, each charging that they had been robbed while in the Woodlawn, or 7th Police, District of the city. Apparently, the *modus operandi* described by the complainants were similar in each instance.

On May 26, 1958, Robert Willin, one of the complaining drivers, observed a man resembling the thief leave an automobile and enter a building at 6157 South Kenwood Avenue. He notified the police who arrived a few minutes later and entered the building, Willin remaining outside. The police officers later emerged with the petitioner and a man named Wesley Price under arrest.

At the trial, and upon hearing in this court, petitioner testified that at about noon on May 26, 1958, he and Price parked a car near 61st and Kenwood and went directly to Price's third floor apartment at 6059 South Kenwood where, at approximately 12:30 p. m., they were taken into custody by the police and placed in a squad car in the alley behind the building. Petitioner states that he asked the arresting officers why he was under arrest and was told that he would "find out later" and that he asked to telephone his sister (with whom he had been living) but was not permitted to do so.

Kemp and Price were then taken to the 7th District Police Station. Kemp was separated from Price and put in a room where a detective took his name and fingerprints. Petitioner testified that he again asked about the charge for which he was being held and was again told that he would find out later. He was then placed in the station house bullpen. Approximately fifteen minutes later, petitioner was returned to the original room where the same detective questioned him as to his employment and prior criminal record. Kemp testified that he asked the detective to allow him to call "my people", but the detective returned him to a cell, telling him that he had nothing to do with the case. After fifteen or twenty minutes in the cell, Kemp was placed in a show-up, the first of several conducted during his detention. He was pointed out, apparently by Willin, the driver who had called the police. It appears that Wesley Price, who was arrested with Kemp, was not in this or any of the subsequent show-ups.

After the show-up, Kemp was again returned to a cell. He states that he renewed his request to be allowed to call his sister and again inquired as to the

charges against him. The lock-up keeper, however, also told him that he was not involved in the matter. Based on petitioner's testimony as to the time of arrest and the activity in the station house, he was returned to his cell after the show-up between 1:30 and 2:00 p. m. on May 26th.

The testimony of the police officers with regard to these details at the hearing conducted by the court is at variance with petitioner's testimony and with their own testimony in the trial court as well. Officer George Kobar, the police officer in charge of Kemp's interrogation, testified in this court that he first saw the petitioner around 11:45 a. m. on the morning of the 26th as he was brought in to the station; that he had been told that Willin had identified Kemp; that upon seeing Kemp he asked him if he committed "the robbery", though not identifying any particular incident, and that Kemp said that he did. Kobar states that Kemp was then placed in a cell where he remained until around 5:00 p. m., when a show-up was held. In the trial court, however, Kobar testified that he did not see the defendant until about 1:30 p. m.; that he asked Kemp for his name and employment (processing which Kemp claims was done by another detective); and, that upon asking this question, Kemp proceeded to tell him, without any prompting and without being advised of any charge, that he was unemployed, that he had a prior criminal record and that he had been in the penitentiary for doing the same thing as he had done this time (i. e., robbery). On cross-examination, however, Kobar stated that Kemp's oral confession did not come until after he had been identified in a show-up (again, apparently by Willin). Other detectives, however, testified—both at trial and at the instant hearing—that Kemp arrived in the station house around noon, that Kobar was present, and that Kemp made an immediate oral confession as soon as Kobar asked him to state "what happened".

These variations are not necessarily essential to the determination of the question before the court. However, they point up the problems which arise when a judicial inquiry to determine whether a deprivation of constitutional rights occurred must be made long after the events took place.

As regards the instant case, it would appear to be almost inconceivable that Kemp, a man twice previously convicted and sentenced to the penitentiary, would —without being advised of any charge and without being asked a direct question—volunteer his entire past record and confess guilt to a specific crime the moment he was brought to the police station. It is even more doubtful in view of the uncontroverted fact that no attempt was then made to elicit a full statement from him. Petitioner's testimony —that he inquired as to the reason for his arrest and that he sought to call his sister—appears to be accurate. Moreover, if Officer Kobar's trial testimony is correct and he did not see Kemp in the station until 1:30 p. m. (possibly, in light of his testimony on cross-examination before this Court, not until after a first show-up), petitioner's allegation that the processing was done by other officers to whom no confession was made is also probably accurate.

At this point, the testimony given by the principals in this court as to the events of May 26 becomes even more divergent. The conflict centers principally around the issue of interrogation.

Officer Kobar states that Kemp was not interrogated on the day of arrest. According to him, Kemp was placed in a cell following the initial oral "confession" and remained in the cell until the next morning, except for a short period later that same afternoon when a second show-up was held. He testifies that he made no attempt to question Kemp except for a short conversation after the second show-up, during which time Kemp remained in his cell (and again admitted his guilt).

Detective Walter McCarthy, however, recalls seeing Kemp being questioned by Kobar in the "Detectives Room" on the first floor of the station house late on

the afternoon of the 26th and noted that a number of unidentified detectives were also present. He states that Kemp made an oral admission of guilt at that time. The other detectives involved in the Kemp case, Detectives Richard Dickson and John Geimer did not recall seeing Kemp on May 26 except when he was brought in under arrest. Kemp also testified that he saw Dickson and Geimer on the first floor of the station house when he was first processed and states that they did not participate in any interrogation session.

In contrast to Detective Kobar's testimony, Kemp states that he was taken from his cell shortly after the first show-up by Kobar and two unidentified detectives and brought to a second floor room. There he asked permission to call his sister and asked to be told of the charge upon which he was being held. The officers refused and asked him to sign a typewritten statement. He asserts that he was not asked to read the statement nor was he told of its contents. Upon his refusal to sign he was returned to the cell. The first interrogation session lasted 15 or 20 minutes, occurring sometime around 3:00 p. m.

After an hour's lapse of time he was again brought up to the second floor. During this interrogation, lasting about one hour, he was again asked to sign a statement. He replied that he did not know what the officers were talking about. During the course of the interrogation, he was allegedly struck four or five times by the two unidentified officers. At his trial, Kemp stated that these blows were to his body and that he was struck behind the neck during a session on the next day. At this court's hearing, he testified that he was struck in the back of the neck during this session. He did not pinpoint the location of the blows allegedly inflicted at the interrogation sessions on the 27th.

Following this second session he states that he was returned to his cell again, remaining there until a second show-up was held. The testimony of all witnesses establishes that Kobar advised him that a second man had identified him after the second show-up and that he remained lodged in his cell until the following morning. Kemp, however, additionally claims that he again asked Kobar to be allowed to call his sister, which request was again refused.

Two additional details must be considered. First, we note that Wesley Price, who had been arrested with Kemp, remained in the station house lock-up apparently without being questioned or placed in a show-up. Despite Kemp's claimed oral confessions, Price remained incarcerated until the morning of May 27, at which time he was released. Second, Kemp's allegations concerning the two interrogation sessions on May 26 could have been refuted by the testimony of the station lock-up keeper and the lock-up keeper's records which are supposed to indicate each and every time a prisoner is taken out of a cell and the length of time spent outside the cell. At the trial in the Criminal Court, the lock-up keeper, Charles Kay, was called to testify. However, Kay could not recall the movements of the petitioner in any respect. He testified that he placed Kemp in a cell around 2:00 p. m. on May 26, but did not know if he was ever removed from the cell on either the 26th or the 27th. His written record, which, if properly kept, would have resolved any doubt, was never produced. At the hearing in this court, neither Kay nor the record was produced.

The difficulty in ascertaining the true happenings on the 26th is further compounded when the testimony with respect to the show-ups is considered. Officer Kobar testified that a second show-up was held about 4:00 p. m., after which he questioned Kemp in his cell for a short time and Kemp again orally confessed to the Mitchell robbery as well as to the Willin robbery. Other officers testify to a show-up at around 5:00 p. m., Kemp to one at 6:00 p. m. The opinion of the Illinois Supreme Court recites a finding that three show-ups were conducted and that at a 6:00 p. m. show-up Kemp was identified by Mitchell. The

time of the other show-up is not indicated. There is similar confusion in the testimony before us as to whether all three show-ups took place on May 26 or whether two were held on the 26th and one the next morning, the 27th. In any event, it is undisputed that Kobar did not tell Kemp that he had been "fingered" three times until the 11:30 a. m. interrogation on the 27th.

We turn next to the events of May 27. All participants agree that at some time during this day Kemp signed three typewritten statements, purporting to be actual transcripts of questions put to Kemp by Detective Kobar and answers actually given by Kemp. Each statement contains an admission of guilt with respect to a truck-driver robbery: one relative to the Mitchell robbery, for which Kemp was tried; one regarding the Willin robbery; and one as to the robbery of Harold Cohn. The disputed allegations concern the circumstances under which these signatures were obtained.

Each statement is prefaced by an introductory paragraph setting forth the time and the names of the officers involved in the interrogation. They show that Detective Kobar did the questioning; that Detective McCarthy was "present"; that the first two statements were taken at 11:30 a. m. and 11:50 a. m., respectively, and were typed by Detective Dickson; and that the third statement was typed at 12:45 p. m. by Detective Geimer.

The first two statements are substantially similar although not identical. The narrative paragraphs setting out the details of each crime are also slightly different. Each of these statements end with the following remarks:

"Q. After you have read this statement and find that it contains just what you told me will you sign it.

"A. Yes.

"Q. Why.

"A. Because it is the truth."

On the whole the language of these two statements reflects a rather stilted and highly formal conversation, if in fact a conversation of this sort actually took place.

The third statement, although purportedly typed by Geimer, also is in the form of a verbatim record of questions put by Kobar and what was said by Kemp. It would appear that Kobar's style of questioning and Kemp's answers underwent a substantial change in the space of one hour. The questions are posed in a more conversational style; the answers ascribed to Kemp are full sentences rather than simply "yes" or "no":

(First and Second Statements)

"Q. Were you armed at the time of this robbery.

"A. No sir."

(Third Statement)

"Q. Did you have a gun when you held this man up?

"A. No I just held my hand in my pocket."

Each statement indicates that Kemp, although unemployed, resides at the Kimbark Hotel, 6324 Kimbark Avenue. The third statement contains, in addition, a statement by Kemp that he lives alone. At his trial, however, Kemp put his address at 6617 (or 6619) Kenwood Avenue and testified that he was living with his sister and brother-in-law. He stated that he had lived at the Kimbark Hotel some time in the past. No attempt was made to clarify or impeach Kemp's testimony either by other witnesses or documentary evidence.

The police officers' trial testimony was in accord with the introductory paragraph of each statement. Each officer there stated that the interrogation began around 11:00 a. m. or 11:30 a. m. on the 27th. Dickson stated that he typed the first two statements as Kobar asked the questions and that there were no preliminaries: they started taking the statement immediately. Kobar testified that it took about 25 minutes for the first statement and that the interrogation session lasted about 1½ hours. McCarthy who was present as a "witness", thought that Kobar was typing the statements.

Geimer stated that he typed the third statement, entering the interrogation room at about noon and finding Kobar, McCarthy and Kemp in the room. Dickson was not then present.

At the hearing in this court, Kobar stated that the interrogation session resulting in the statements began at 9:00 or 9:15 a. m. on the 27th and lasted until approximately 11:00 a. m. McCarthy testified that it began around 10:00 a. m. and lasted until about 11:30. Dickson had a faint recollection of being present when the statement was taken but was unable to recall any details. Geimer testified that he had no recollection of either seeing Kemp or typing a statement during any interrogation session.

Kemp's testimony in this court is substantially the same as presented to the trial judge. He states that he was placed in another show-up on the morning of the 27th. Afterward, around 11:30 a. m. or noon, he was again interrogated by Kobar and two other officers (not Dickson or McCarthy). Kemp alleges that he was still inquiring as to the reason for his detention and requesting permission to call his sister. During this third interrogation, also about one hour long, a typewritten statement was again put before him. He continued to refuse and was allegedly struck again several times by the other officers with Kobar. Upon being returned to his cell he renewed his request to make a telephone call.

Later that afternoon he was interrogated for the fourth and final time. At this session he alleges that, in addition to physical abuse and the continued refusal to allow him to make a phone call, Kobar's interrogation dwelt principally on Kemp's situation as a two-time loser and the possibility of life imprisonment as an habitual criminal. At the end of this session, he signed the statements but claims he did so without reading them. He states that no typewritten transcript of the questioning was made in his presence; that the statements were handed to him already typed. After he signed the statements, he was allowed to call his sister.

Kobar denies that Kemp was subjected to any physical abuse. He claims that Kemp never asked to make a phone call. In the trial court, he stated that he never mentioned the Habitual Criminal Act to Kemp. The other officers' testimony was identical. At this court's hearing, he characterized Kemp's attitude during the interrogation as "very cooperative", but on further questioning admitted that he had advised Kemp of the possibility that he could be charged as an habitual criminal. We would have to conclude, therefore, that Detectives McCarthy, Dickson, and Geimer either (a) were present but failed to hear Kobar make such a statement, (b) could not remember it at trial or (c) were in fact not present (as Kemp alleges). Kobar was unable to offer any explanation for having raised the issue of the habitual criminal charge in view of Kemp's purportedly cooperative conduct and his willingness—indeed, if we were to accept Kobar's testimony, Kemp's desire—to confess to every crime the police asked him about.

The opportunity for physical abuse was certainly present and, in light of the many factors noted above which make the reliability of the police officers' testimony somewhat questionable, Kemp's allegations with respect to having been struck during interrogation and before signing the statements may in fact be wholly or partly accurate. The court may not, however, rely on conjecture and possible inferences to resolve this issue and there is no evidence sufficiently certain to support a finding of fact. Unfortunately, the trial court made no finding of fact but we must infer from its admission of the confession into evidence that it concluded no such action occurred. In the present state of the record before it, this court, whatever its doubts, may not find to the contrary.

Putting the issue of physical abuse to the side, certain other allegations of the petition are substantially uncontroverted. Whether Kemp requested permission to make a phone call or not (and we cannot believe that such a request was not made), it is undisputed that in fact he

had no contact with any member of his family while detained in the police station until after the three statements were signed. The police witnesses do not deny that Kemp made a call to his sister in the late afternoon or early evening of May 27, nor do they deny that shortly after this call his sister appeared at the station house with food for him. On the undisputed facts it is clear that Kemp was not allowed to contact any friendly person, relatives or counsel, until after signing the confessions.

Similarly, no one denies that Kemp was not taken before a magistrate until at least two days after his arrest. If in fact he orally confessed upon entering the station house as Officer Kobar asserts, and the confession was substantiated by Willin's identification shortly thereafter, why were no charges formally placed against him? There is no documentary record of Kemp's ever having been brought before a magistrate. The testimony of the police is silent on this point and Kemp, while not sure, believes such a proceeding may have taken place on May 28. In any event, the record of the Criminal Court shows that Kemp was not indicted or arraigned until June 2 and counsel was not appointed for him until after his arraignment.

No one denies that he was not given even the most rudimentary advice as to his rights. He was not advised of his right to counsel, his right to remain silent, or that anything he said might subsequently be used against him at a trial. If, in fact, he sought to confess immediately upon arriving at the station house, such a warning would have been particularly crucial.

Kemp's allegations respecting the threat of life imprisonment, while denied at his trial, now have been substantiated. True, Kobar does not admit to a "threat", nor to a promise of leniency. These matters were left to Kemp's imagination. Kobar's references to possible penalties were either intended to frighten Kemp or there was no point in making them. Kemp, despite his eighth grade education, was readily able to grasp their meaning. Kobar admits that Kemp signed the statements after the possibility of facing life imprisonment was pointed out. This being the case, it is clear that the confessions are not a transcription of the questions and answers at the interrogation session. The officers did not simply "start right in" as Dickson testified. Again, either Dickson did not hear what was going on while he was supposedly making a verbatim transcript; or he does not remember; or possibly he was not present.

The petitioner also alleges that during the interrogation period he was not fed, except for one sandwich given him by a fellow prisoner on the evening of May 26. At trial, the prosecution relied on the testimony of the lock-up keeper, Charles Kay, to rebut this charge. Kay testified that it was his practice to give every prisoner in the lock-up a bologna sandwich at 8:30 a. m. and 2:30 p. m. However, as we have already noted, Kay had no idea of Kemp's whereabouts after first receiving him at 2:00 p. m. on the 26th. By his own testimony he did not know if Kemp was ever removed from the lock-up for interrogation. Moreover, it is undisputed that the first thing Kemp's sister did when he finally was permitted to call her was to bring him food.

For the reasons already set forth, the officers' claim that Kemp was not subjected to any interrogation on the day of arrest is unbelievable. If there had been an oral confession it would be unusual to delay reducing it to writing until the next day; if there was no oral confession, it would be similarly unusual if the prisoner was simply advised that he had been identified by a victim and no attempt was made to elicit a statement. Moreover, the lock-up keeper's record, which would have shed light on the issue, has never been produced.

Assuming that the time typed on the statements is correct, Kemp was held for about twenty-four hours before his signature was obtained. If, on the other hand, Kemp's allegations respecting a fourth interrogation are correct, the statements were signed after some

thirty hours' illegal detention. As we have noted, the opinion of the Illinois Supreme Court states that Kemp's confession came after twenty-eight hours' detention. The apparent contradiction between this finding, the time endorsed on the statements and the police officers' testimony is not explained.

Given the factual setting described at length above, the court must now make its determination as to whether or not Kemp's statement confessing to the Mitchell robbery was secured in violation of his constitutional rights or was given voluntarily.

■ Before turning to the substantive legal issue presented, however, we must consider respondent's claim that the petitioner has failed to exhaust state court remedies available to him. Kemp's case has been before the highest court of the state. Accordingly, he is not required to seek collateral relief by state habeas corpus or post-conviction relief procedures before proceeding in this court. See Brown v. Allen, 344 U.S. 443, 447–449, 73 S.Ct. 397, 97 L.Ed. 469 (1953); United States ex rel. Crump v. Sain, 264 F.2d 424 (7 Cir. 1959).

■■ Respondent suggests that the present petition raises new issues not presented to the Illinois Supreme Court. Specifically, he points to Kemp's contentions that he (a) was not brought before a judicial officer for a preliminary hearing; (b) was not advised of his right to counsel; (c) was not advised of his right to remain silent; and (d) was not allowed to call his sister for assistance.

The court believes that these issues were necessarily before the Illinois Supreme Court. The opinion filed demonstrates that the Illinois court was fully aware of the extended detention. The prosecution's brief filed therein was not limited to a discussion of possible physical coercion; it raised and attempted to negate any possible psychological coercion as well. The record before that court contained Kemp's repeated assertions that he was kept from contacting his relatives. On the other hand, it

contains no evidence that he was advised of his right to counsel, to remain silent or that anything he said might be used against him. These details were sufficient, in and of themselves, to raise substantial questions regarding the possible abuse of Kemp's constitutional rights at the hands of the police. To be sure, the Illinois court's opinion is limited to a finding that there was evidence which, if believed, would refute petitioner's allegations. However, the exhaustion of state remedies is not measured by the language of the opinion, but by the record before the reviewing court. Accordingly, we conclude that the instant petition is properly brought in a federal forum.

■ The court has examined the transcript of the trial, the testimony at the hearing on the petition and the briefs filed both here and in the Illinois Supreme Court with considerable care. In view of the factual setting already described, we cannot conclude that the written confession here involved was freely and voluntarily made or subscribed to and, accordingly, we are compelled to the conclusion that petitioner's constitutional rights were infringed when the statement was admitted into evidence.

This conclusion is supported by two lines of analysis which, while different, are not mutually exclusive. The court's initial approach, a consideration of the "totality of circumstances" surrounding Kemp's detention and interrogation, is now common in the case law. However, the situation described herein prompts the court to consider, additionally, the effect of recent developments in criminal law and procedure on the standards of constitutional protection applicable to the detention and interrogation of persons arrested by state authorities.

Petitioner was thirty-three years old when arrested. He had been involved in criminal matters before. He had an eighth-grade education. Clearly, he was not a child of tender years as the defendants in Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) and Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224

(1947). Nor was he, as the defendant in Lynumn v. State of Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), inexperienced with police procedures. The protection of the Constitution, however, extends to all. It is not limited to the young or to persons clothed with prior innocence. All men are susceptible to coercive practices. The prisoner's ability to resist does not depend solely on age or experience. It is also a function of the techniques employed by the police.

The young, or those with limited mental ability (see Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 [1958]), may be persuaded by direct suggestion. However, the knowledge and experience of men who have had frequent contacts with legal authorities may be employed against them with the same result. Neither extensive questioning (Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 [1944]), nor physical torture (Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 [1936]), nor even the use of a psychiatrist as an interrogator (Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 [1954]) is necessary.

■ The interrogation of the petitioner was not overly lengthy. No session lasted more than one and one-half or one and three-quarters hours. The total interrogation time was about four and one-half hours. But the fact that the questioning sessions were short does not assure that the confession was given voluntarily. See Haynes v. State of Washington, 373 U.S. 503, 504, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

Indeed, the treatment accorded Kemp closely resembles that involved in Haynes. Haynes, too, had a prior criminal record. Like Kemp, his requests to call relatives were refused. Haynes specifically asked to call an attorney. It would be naive, however, to assume that Kemp, when seeking to contact his sister, was merely interested in advising her of his whereabouts or asking for food. If Kemp's prior contacts with the law have

any evidentiary value, they suggest that his attempts to contact his family would have led to the retention of counsel to protect his rights.

Haynes' confession came after sixteen hours of illegal incommunicado detention; Kemp's after an even longer period. This detention cannot be ignored in evaluating the "totality of circumstances". Even if we accept Kobar's contention that there were no formal interrogation sessions on May 26, there would still be the undisputed fact that Kemp was asked about "a crime" or, at best "a robbery" without being given any details and without being charged with a specific act. It was obvious that he was a suspect. Although his companion, Price, was arrested with him, the investigatory procedures apparently were directed at Kemp alone.

After each show-up in which Kemp appeared, he was told that a victim had pointed him out. Admittedly, no one told him that the police were attempting to solve three similar crimes. Not even after the third identification was he told that the police investigation was completed. So far as Kemp knew, the chain of show-ups, reports that he had been identified and refusals to allow him to contact his sister might have continued. And, in the course of twenty-four to thirty hours, he was given sufficient opportunity to consider, alone, the full range of possible steps the police and prosecutors might take.

Finally, the spectre of possible life imprisonment was paraded before him. Psychological pressure, unlike physical coercion, does not require direct action by the police. It leaves no external evidence. To convince the court that the writ of habeas corpus should issue, the petitioner must do more than put forth his own subjective analysis of the treatment accorded him. The facts enumerated above, the substantial inconsistencies which appear in the testimony of the police officers, the doubts revealed by a close examination of the statements obtained and the failure, by the prosecution at the trial and the respondent in

this court, to produce evidence which should have been easily available and which could have refuted petitioner's contentions form a background against which Kemp's relation of the factors leading to his signing the confessions achieves objective confirmation.

Under these circumstances, we conclude that the statements obtained from the petitioner were not clearly the product of the voluntary exercise of his free will and therefore not properly admissible at his trial.

While the findings above are fully sufficient to require issuance of the writ, that conclusion is supported by other principles as well. Our constitutional traditions and legal institutions are grounded on the conviction that a society which seeks both to maximize individual liberty and preserve community order must be governed by a sense of justice. To this end we have evolved principles and procedures, among them the right to trial by jury, the right to counsel, the privilege against self-incrimination, and the prohibitions against arbitrary exercise of power incorporated in the concept of due process of law.

The interpretation of the Fourteenth Amendment in recent years has been further clarified in various circumstances, and the application of the Fifth and Sixth Amendments to the States has been confirmed by the Supreme Court. The constitutional importance of uniform standards of protection for defendants in criminal cases is evident in the Court's decisions in Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1963); Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); and Pointer v. State of Texas, 85 S.Ct. 1065 (1965).

Of these decisions, Gideon, Malloy and Escobedo are particularly relevant to the facts of the instant petition. They affirm the principle that confessions obtained from persons accused of a crime after prolonged detention are constitutionally inadmissible as evidence unless, within a reasonable time after the accusatory process has begun, the accused is advised of his right to counsel, his right to remain silent and the fact that any statement made may be used against him in a trial. While it may be more desirable to employ a disinterested third person, such as a magistrate, to give a potential defendant this advice, the constitutional imperative is that the information be conveyed at the inception of the accusatory process either by the police officials or by a judicial officer.

The importance of this requirement of the Fifth and Fourteenth Amendments as a necessary adjunct of the right to counsel confirmed in Gideon and the privilege against self-incrimination affirmed in Malloy is fully stated in the Court's opinion in Escobedo:

" * * * Petitioner had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so. At the time of his arrest and throughout the course of the interrogation, the police told petitioner that they had convincing evidence that he had fired the fatal shots. Without informing him of his absolute right to remain silent in the face of this accusation, the police urged him to make a statement." * * *

"In Gideon v. Wainwright, 372 U. S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, we held that every person accused of a crime, whether state or federal, is entitled to a lawyer at trial. The rule sought by the State here, however, would make the trial no more than an appeal from the interrogation; and the 'right to use counsel at the formal trial [would be] a very hollow thing [if], for all practical purposes, the conviction is already assured by pretrial examination.' In re Groban, 352 U.S. 330, 344, 77 S.Ct. 510, 519, 1 L.Ed.2d 376 (Black, J., dissenting).

" * * * The right to counsel would indeed be hollow if it began at a period when few confessions were obtained. There is necessarily a direct relationship between the importance of a stage to the police in their quest for a confession and the criticalness of that stage to the accused in his need for legal advice. Our Constitution, unlike some others, strikes the balance in favor of the right of the accused to be advised by his lawyer of his privilege against self-incrimination." 378 U.S. at 485, 487–488, 84 S.Ct. 1764.

██ Once the accusatory process and the attempt to elicit incriminating statements has begun, the failure to warn the suspect of his absolute constitutional right to remain silent and the failure to give him an opportunity to consult with counsel is a violation of the Constitution. Under such circumstances, "no statement elicited by the police during the interrogation may be used against [the suspect] him at a criminal trial." 378 U.S. 491, 84 S.Ct. 1765.

As Mr. Justice White, dissenting, points out, the application of Escobedo in the light of prior Supreme Court decisions cannot depend upon "whether the accused has retained his own counsel (citing cases) or has asked to consult with counsel in the course of interrogation." 378 U.S. at 495, 84 S.Ct. at 1767. It would offend our sense of justice to conclude that a right so essential to our adversary system could be so conditioned where the accused has not been informed of his rights and particularly, in the circumstances here presented, where the accused is given no opportunity to contact family or counsel until after a confession has been obtained.

Absent the assurance that the accused will be advised of his right to remain silent and the possibility that his statements may be used in prosecuting him; that he will be informed of his right to counsel and that he will be given an opportunity to secure counsel, the constitutional rights confirmed in Gideon, Malloy and Escobedo lose their impact. They become available only to those who are fully aware of their rights and are able to exercise them in the face of police interrogation. As noted earlier, constitutional rights are not so tenuous.

As we read the holdings of the Supreme Court previously referred to, they require the exclusion from evidence of any confession obtained by interrogation prior to either a constitutional warning by the interrogating official or, in the alternative, presentment before a magistrate where such warning is given.

It should be noted that the practice of advising a defendant of his right not to answer questions, to consult counsel and that anything he says may be subsequently used against him has been followed by the Federal Bureau of Investigation and federal law enforcement agencies for many years without impairing their effectiveness while at the same time increasing the probable accuracy of statements or confessions obtained by them.

██ This procedure was admittedly not followed in Kemp's case and constitutes a second reason why his confession should not have been admitted into evidence. Accordingly, we conclude that Thomas E. Kemp is being unlawfully detained in the Illinois State Penitentiary and he is entitled to a writ of habeas corpus and should be discharged from respondent's custody.

Of course, the State is at liberty to seek a new trial in this matter, subject, however, to the exclusion of prohibited evidence in accordance with this opinion. For this reason, and to allow respondent to determine whether any further procedural steps should be taken, we will delay our order until sixty days hence.

At that time the instant petition shall be granted and the writ of habeas corpus shall issue.