## BROWN ET AL. *v.* MISSISSIPPI.

No. 301. Argued January 10, 1936.—Decided February 17, 1936.

*Mr. Earl Brewer,* with whom *Mr. J. Morgan Stevens* was on the brief, for petitioners.

*Messrs. William D. Conn, Jr.,* and *William H. Maynard,* Assistant Attorneys General of Mississippi, with whom *Mr. Greek L. Rice,* Attorney General, was on the brief, for respondent.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The question in this case is whether convictions, which rest solely upon confessions shown to have been extorted by officers of the State by brutality and violence, are consistent with the due process of law required by the Fourteenth Amendment of the Constitution of the United States.

Petitioners were indicted for the murder of one Raymond Stewart, whose death occurred on March 30, 1934. They were indicted on April 4, 1934, and were then arraigned and pleaded not guilty. Counsel were appointed by the court to defend them. Trial was begun the next morning and was concluded on the following day, when they were found guilty and sentenced to death.

Aside from the confessions, there was no evidence sufficient to warrant the submission of the case to the jury. After a preliminary inquiry, testimony as to the confessions was received over the objection of defendants' counsel. Defendants then testified that the confessions were false and had been procured by physical torture. The case went to the jury with instructions, upon the request of defendants' counsel, that if the jury had reasonable doubt as to the confessions having resulted from coercion, and that they were not true, they were not to be considered as evidence. On their appeal to the Su-

preme Court of the State, defendants assigned as error the inadmissibility of the confessions. The judgment was affirmed. 158 So. 339.

Defendants then moved in the Supreme Court of the State to arrest the judgment and for a new trial on the ground that all the evidence against them was obtained by coercion and brutality known to the court and to the district attorney, and that defendants had been denied the benefit of counsel or opportunity to confer with counsel in a reasonable manner. The motion was supported by affidavits. At about the same time, defendants filed in the Supreme Court a "suggestion of error" explicitly challenging the proceedings of the trial, in the use of the confessions and with respect to the alleged denial of representation by counsel, as violating the due process clause of the Fourteenth Amendment of the Constitution of the United States. The state court entertained the suggestion of error, considered the federal question, and decided it against defendants' contentions. 161 So. 465. Two judges dissented. *Id.*, p. 470. We granted a writ of certiorari.

The grounds of the decision were (1) that immunity from self-incrimination is not essential to due process of law, and (2) that the failure of the trial court to exclude the confessions after the introduction of evidence showing their incompetency, in the absence of a request for such exclusion, did not deprive the defendants of life or liberty without due process of law; and that even if the trial court had erroneously overruled a motion to exclude the confessions, the ruling would have been mere error reversible on appeal, but not a violation of constitutional right. *Id.*, p. 468.

The opinion of the state court did not set forth the evidence as to the circumstances in which the confessions were procured. That the evidence established that they were procured by coercion was not questioned. The state

court said: "After the state closed its case on the merits, the appellants, for the first time, introduced evidence from which it appears that the confessions were not made voluntarily but were coerced." *Id.,* p. 466. There is no dispute as to the facts upon this point and as they are clearly and adequately stated in the dissenting opinion of Judge Griffith (with whom Judge Anderson concurred)—showing both the extreme brutality of the measures to extort the confessions and the participation of the state authorities—we quote this part of his opinion in full, as follows (*Id.,* pp. 470, 471):

"The crime with which these defendants, all ignorant negroes, are charged, was discovered about one o'clock p. m. on Friday, March 30, 1934. On that night one Dial, a deputy sheriff, accompanied by others, came to the home of Ellington, one of the defendants, and requested him to accompany them to the house of the deceased, and there a number of white men were gathered, who began to accuse the defendant of the crime. Upon his denial they seized him, and with the participation of the deputy they hanged him by a rope to the limb of a tree, and having let him down, they hung him again, and when he was let down the second time, and he still protested his innocence, he was tied to a tree and whipped, and still declining to accede to the demands that he confess, he was finally released and he returned with some difficulty to his home, suffering intense pain and agony. The record of the testimony shows that the signs of the rope on his neck were plainly visible during the so-called trial. A day or two thereafter the said deputy, accompanied by another, returned to the home of the said defendant and arrested him, and departed with the prisoner towards the jail in an adjoining county, but went by a route which led into the State of Alabama; and while on the way, in that State, the deputy stopped and again severely whipped the defendant, declaring that he would continue the whipping

until he confessed, and the defendant then agreed to confess to such a statement as the deputy would dictate, and he did so, after which he was delivered to jail.

"The other two defendants, Ed Brown and Henry Shields, were also arrested and taken to the same jail. On Sunday night, April 1, 1934, the same deputy, accompanied by a number of white men, one of whom was also an officer, and by the jailer, came to the jail, and the two last named defendants were made to strip and they were laid over chairs and their backs were cut to pieces with a leather strap with buckles on it, and they were likewise made by the said deputy definitely to understand that the whipping would be continued unless and until they confessed, and not only confessed, but confessed in every matter of detail as demanded by those present; and in this manner the defendants confessed the crime, and as the whippings progressed and were repeated, they changed or adjusted their confession in all particulars of detail so as to conform to the demands of their torturers. When the confessions had been obtained in the exact form and contents as desired by the mob, they left with the parting admonition and warning that, if the defendants changed their story at any time in any respect from that last stated, the perpetrators of the outrage would administer the same or equally effective treatment.

"Further details of the brutal treatment to which these helpless prisoners were subjected need not be pursued. It is sufficient to say that in pertinent respects the transcript reads more like pages torn from some medieval account, than a record made within the confines of a modern civilization which aspires to an enlightened constitutional government.

"All this having been accomplished, on the next day, that is, on Monday, April 2, when the defendants had been given time to recuperate somewhat from the tortures to which they had been subjected, the two sheriffs, one

of the county where the crime was committed, and the other of the county of the jail in which the prisoners were confined, came to the jail, accompanied by eight other persons, some of them deputies, there to hear the free and voluntary confession of these miserable and abject defendants. The sheriff of the county of the crime admitted that he had heard of the whipping, but averred that he had no personal knowledge of it. He admitted that one of the defendants, when brought before him to confess, was limping and did not sit down, and that this particular defendant then and there stated that he had been strapped so severely that he could not sit down, and as already stated, the signs of the rope on the neck of another of the defendants were plainly visible to all. Nevertheless the solemn farce of hearing the free and voluntary confessions was gone through with, and these two sheriffs and one other person then present were the three witnesses used in court to establish the so-called confessions, which were received by the court and admitted in evidence over the objections of the defendants duly entered of record as each of the said three witnesses delivered their alleged testimony. There was thus enough before the court when these confessions were first offered to make known to the court that they were not, beyond all reasonable doubt, free and voluntary; and the failure of the court then to exclude the confessions is sufficient to reverse the judgment, under every rule of procedure that has heretofore been prescribed, and hence it was not necessary subsequently to renew the objections by motion or otherwise.

"The spurious confessions having been obtained—and the farce last mentioned having been gone through with on Monday, April 2d—the court, then in session, on the following day, Tuesday, April 3, 1934, ordered the grand jury to reassemble on the succeeding day, April 4, 1934, at nine o'clock, and on the morning of the day last men-

tioned the grand jury returned an indictment against the defendants for murder. Late that afternoon the defendants were brought from the jail in the adjoining county and arraigned, when one or more of them offered to plead guilty, which the court declined to accept, and, upon inquiry whether they had or desired counsel, they stated that they had none, and did not suppose that counsel could be of any assistance to them. The court thereupon appointed counsel, and set the case for trial for the following morning at nine o'clock, and the defendants were returned to the jail in the adjoining county about thirty miles away.

"The defendants were brought to the courthouse of the county on the following morning, April 5th, and the so-called trial was opened, and was concluded on the next day, April 6, 1934, and resulted in a pretended conviction with death sentences. The evidence upon which the conviction was obtained was the so-called confessions. Without this evidence a peremptory instruction to find for the defendants would have been inescapable. The defendants were put on the stand, and by their testimony the facts and the details thereof as to the manner by which the confessions were extorted from them were fully developed, and it is further disclosed by the record that the same deputy, Dial, under whose guiding hand and active participation the tortures to coerce the confessions were administered, was actively in the performance of the supposed duties of a court deputy in the courthouse and in the presence of the prisoners during what is denominated, in complimentary terms, the trial of these defendants. This deputy was put on the stand by the state in rebuttal, and admitted the whippings. It is interesting to note that in his testimony with reference to the whipping of the defendant Ellington, and in response to the inquiry as to how severely he was whipped, the deputy stated, 'Not too much for a negro; not as much as I would have done if it were left to me.' Two others who had participated

in these whippings were introduced and admitted it—not a single witness was introduced who denied it. The facts are not only undisputed, they are admitted, and admitted to have been done by officers of the state, in conjunction with other participants, and all this was definitely well known to everybody connected with the trial, and during the trial, including the state's prosecuting attorney and the trial judge presiding."

1. The State stresses the statement in *Twining* v. *New Jersey,* 211 U. S. 78, 114, that "exemption from compulsory self-incrimination in the courts of the States is not secured by any part of the Federal Constitution," and the statement in *Snyder* v. *Massachusetts,* 291 U. S. 97, 105, that "the privilege against self-incrimination may be withdrawn and the accused put upon the stand as a witness for the State." But the question of the right of the State to withdraw the privilege against self-incrimination is not here involved. The compulsion to which the quoted statements refer is that of the processes of justice by which the accused may be called as a witness and required to testify. Compulsion by torture to extort a confession is a different matter.

The State is free to regulate the procedure of its courts in accordance with its own conceptions of policy, unless in so doing it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder* v. *Massachusetts, supra; Rogers* v. *Peck,* 199 U. S. 425, 434. The State may abolish trial by jury. It may dispense with indictment by a grand jury and substitute complaint or information. *Walker* v. *Sauvinet,* 92 U. S. 90; *Hurtado* v. *California,* 110 U. S. 516; *Snyder* v. *Massachusetts, supra.* But the freedom of the State in establishing its policy is the freedom of constitutional government and is limited by the requirement of due process of law. Because a State may dispense with a jury trial, it does not follow that it may substitute trial by ordeal. The rack and tor-

ture chamber may not be substituted for the witness stand. The State may not permit an accused to be hurried to conviction under mob domination—where the whole proceeding is but a mask—without supplying corrective process. *Moore* v. *Dempsey,* 261 U. S. 86, 91. The State may not deny to the accused the aid of counsel. *Powell* v. *Alabama,* 287 U. S. 45. Nor may a State, through the action of its officers, contrive a conviction through the pretense of a trial which in truth is "but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured." *Mooney* v. *Holohan,* 294 U. S. 103, 112. And the trial equally is a mere pretense where the state authorities have contrived a conviction resting solely upon confessions obtained by violence. The due process clause requires "that state action, whether through one agency or another, shall be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." *Hebert* v. *Louisiana,* 272 U. S. 312, 316. It would be difficult to conceive of methods more revolting to the sense of justice than those taken to procure the confessions of these petitioners, and the use of the confessions thus obtained as the basis for conviction and sentence was a clear denial of due process.

2. It is in this view that the further contention of the State must be considered. That contention rests upon the failure of counsel for the accused, who had objected to the admissibility of the confessions, to move for their exclusion after they had been introduced and the fact of coercion had been proved. It is a contention which proceeds upon a misconception of the nature of petitioners' complaint. That complaint is not of the commission of mere error, but of a wrong so fundamental that it made the whole proceeding a mere pretense of a trial and rendered the conviction and sentence wholly void. *Moore* v *Dempsey, supra.* We are not concerned with a mere

question of state practice, or whether counsel assigned to petitioners were competent or mistakenly assumed that their first objections were sufficient. In an earlier case the Supreme Court of the State had recognized the duty of the court to supply corrective process where due process of law had been denied. In *Fisher* v. *State,* 145 Miss. 116, 134; 110 So. 361, 365, the court said: "Coercing the supposed state's criminals into confessions and using such confessions so coerced from them against them in trials has been the curse of all countries. It was the chief inequity, the crowning infamy of the Star Chamber, and the Inquisition, and other similar institutions. The constitution recognized the evils that lay behind these practices and prohibited them in this country. . . . The duty of maintaining constitutional rights of a person on trial for his life rises above mere rules of procedure and wherever the court is clearly satisfied that such violations exist, it will refuse to sanction such violations and will apply the corrective."

In the instant case, the trial court was fully advised by the undisputed evidence of the way in which the confessions had been procured. The trial court knew that there was no other evidence upon which conviction and sentence could be based. Yet it proceeded to permit conviction and to pronounce sentence. The conviction and sentence were void for want of the essential elements of due process, and the proceeding thus vitiated could be challenged in any appropriate manner. *Mooney* v. *Holohan, supra.* It was challenged before the Supreme Court of the State by the express invocation of the Fourteenth Amendment. That court entertained the challenge, considered the federal question thus presented, but declined to enforce petitioners' constitutional right. The court thus denied a federal right fully established and specially set up and claimed and the judgment must be

*Reversed.*