UNITED STATES of America ex rel. Charles BISHOP, H–4971, Petitioner,

v.

A. T. RUNDLE, Supt., Respondent.

Misc. No. 3826.

United States District Court, E. D. Pennsylvania.

Feb. 5, 1970.

Mary Bell Hammerman, Philadelphia, Pa., for petitioner.

Roger F. Cox, Asst. Dist. Atty., Philadelphia, Pa., for respondent.

## OPINION AND ORDER

FULLAM, District Judge.

Relator, Charles Bishop, was indicted and convicted by jury of the murder of Frances Burrell, and is serving a life sentence.

The principal item of evidence introduced by the Commonwealth against Bishop at his 1963 trial was a written statement which, though partly exculpatory in that relator denied intending to

kill the victim, and contended that the sexual act which preceded the killing was consensual, nevertheless furnished the crucial admission that the relator did have sexual relations with the victim and did strangle her. Since the trial preceded Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R. 3d 1205 (1964), the statement was received in evidence over objection, the jury being instructed to disregard the statement entirely unless convinced of its voluntariness.

■ After the trial, the Commonwealth recognized that Jackson v. Denno, *supra*, and Boles v. Stevenson, 379 U.S. 43, 85 S.Ct. 174, 13 L.Ed.2d 109 (1964) mandated a separate determination of voluntariness. At the hearing of this issue, both sides were content to rely upon the record, without additional evidence, and the trial judge forthwith declared the confession to have been voluntary. In due course, an appeal was taken to the Supreme Court of Pennsylvania, and the conviction was affirmed. Commonwealth v. Bishop, 425 Pa. 175, 228 A.2d 661, cert. denied, 389 U.S. 875, 88 S.Ct. 168, 19 L.Ed.2d 159 (1967). Therefore, relator has exhausted his state remedies as to those contentions raised before the Supreme Court of Pennsylvania. United States ex rel. Bennett v. Rundle, 419 F.2d 599 (3rd Cir. 1969).

In the present habeas corpus petition, relator asserts four grounds for relief:

1. His arrest was illegal, and therefore his subsequent confession was constitutionally inadmissible against him.

2. His confession was not voluntarily given.

3. One of the Commonwealth's experts perjured herself concerning her qualifications.

4. Illegally seized real evidence was admitted against him at trial.

### The Legality of the Arrest

Relator claims that his arrest violated his Fourth Amendment rights because the arresting officers had neither a valid arrest warrant nor probable cause to arrest, and that his written confession was therefore inadmissible at his trial. The Supreme Court of Pennsylvania did not resolve the legality of the arrest, but concluded that even if the arrest were held to be illegal, such illegality would not render the statement constitutionally inadmissible. I have some doubt as to the soundness of that holding, in view of such cases as Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963); Gatlin v. United States, 117 U.S.App.D.C. 123, 326 F.2d 666 (1966); I therefore deem it necessary to consider whether the arrest was constitutionally valid. Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933 (1964); Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

Two independent branches of the Philadelphia Police Department were working on the Burrell case simultaneously, the Homicide Division, and the Special Investigation Squad (SIS). On April 6, 1963, the day the relator was picked up for questioning, the SIS knew that the decedent had been receiving telephone calls from a person named "Peanut", that no such calls had been received at the family residence after her disappearance, and that Charles Bishop was one of several persons in the area who was nicknamed "Peanut." The Commonwealth admits that this information did not constitute probable cause to arrest, but contends that no arrest was made when the police took the relator to the station house for questioning. Under all of the circumstances, I shall assume for present purposes that the petitioner was under arrest when he was first picked up. However, no directly incriminating statements were made while the relator was in the custody of the SIS.

Shortly after noon the same day, the Homicide Division requested the SIS to

bring Bishop to its headquarters. When Sergeant Kennedy of the Homicide Squad made this request he had reason to believe, on the basis of an autopsy report, that the time of death was approximately 9:30 p.m. on March 28, 1963 (habeas corpus notes of testimony [HNT] 82); that a witness had seen the decedent with a young Negro male on the night of March 28th at approximately 9:00 o'clock p.m.; and that the witness had given a description of this youth to Detective Tyler (HNT 90). Sergeant Kennedy also knew of the "Peanut" telephone calls referred to above.

When Bishop was brought to the Homicide Division, Detective Tyler determined that Bishop answered the description of the youth who was with the decedent on the night of her death (HNT 68). At the evidentiary hearing held in this Court, the witness who spoke with Detective Tyler was produced, and confirmed the fact that she had given Detective Tyler a description of the boy who was with the decedent on the night of her death (HNT 114–20).

After a short period of time in the custody of the Homicide Division, Mr. Bishop made his first inculpatory statements, and within a few hours the written statement was transcribed and signed.

Thus the issue is whether or not the information known to the Homicide Divison was sufficient to constitute probable cause. In the words of Mr. Justice Clark,

"* * * Probable cause * * * exists 'where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.' " Ker v. California, *supra*, at 34, 83 S.Ct. at 1630.

In the present case, there was ample evidence that Miss Burrell had been murdered by someone, at about 9:30 p.

m. on March 28, 1963. The real question is whether the police had enough information to lead a reasonable person to believe that the relator was the perpetrator of the crime. This, in turn, involves an evaluation of the reliability of the information known to the police, and, assuming reliability, its cumulative effect.

Under the circumstances, it would seem entirely reasonable to accept at face value the information given by the victim's family concerning the "Peanut" telephone calls. The fact that the relator bore that nickname seems to have been a matter of common knowledge in the neighborhood, derived from several sources. The crucial information, that a person resembling the relator was with the victim shortly before her death, came from a disinterested and seemingly responsible storekeeper in the neighborhood. I therefore conclude that the police could reasonably feel free to rely upon the information at hand. And, while perhaps the matter is not altogether free from doubt, I have concluded that the totality of this information was adequate to warrant a reasonable man in believing that the relator was probably the culprit. Cf. Bailey v. United States, 128 U.S.App.D.C. 354, 389 F.2d 305 (1968); United States v. Dento, 382 F.2d 361 (3rd Cir.1967); Trimble v. United States, 125 U.S.App. D.C. 173, 369 F.2d 950 (1966).

The question remains whether the illegality of the original arrest (as distinguished from the Homicide Division custody) should be deemed to have contaminated the subsequent acquisition of information constituting probable cause. It is clear that evidence which flows from an illegal arrest cannot be used to cure the original illegality. Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960). In our case, however, the original illegal arrest in no way contributed to the police knowledge constituting probable cause. It is of course true that the relator's physical presence pursuant to the unlawful arrest made it possible for the police

to match his description more promptly and conveniently than would otherwise have been the case. But it is clear that relator's presence in custody contributed neither to the knowledge of the witness nor to the accuracy of, or occasion for, her describing him.

### The Admissibility of Relator's Confession

■ Under Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), neither Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) nor Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966) is to be given retroactive application. Since relator's trial was completed on August 5, 1963, the constitutional admissibility of his confession is determined by the pre-*Escobedo-Miranda* cases applying the Fourteenth Amendment standard of due process.

■ The constitutional prerequisite to admissibility is that a confession be "voluntary." The late Mr. Justice Frankfurter accurately described the task of a court in making this determination:

"The inquiry whether, in a particular case, a confession was voluntarily or involuntarily made involves, at the least, a three-phased process. First, there is the business of finding the crude historical facts, the external, 'phenomenological' occurrences and events surrounding the confession. Second, because the concept of 'voluntariness' is one which concerns a mental state, there is the imaginative recreation, largely inferential, of internal, 'psychological' fact. Third, there is the application to this psychological fact of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend both induction from, and anticipation of, factual circumstances." Culombe v. Connecticut, 367 U.S. 568, 603, 81 S. Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961).

The problems outlined in the above analysis are compounded in the present situation, where an evidentiary hearing has been held more than five years after the original trial.

In April of 1963, Charles Bishop was a sixteen-year old Negro with an eighth grade education, poor reading skills, and an I.Q. of 79. A pre-trial psychiatric examination conducted by the Commonwealth classified him as a mild mental defective. It is also noteworthy that petitioner had resided in the City of Philadelphia for only a few weeks before the crime, having moved here from Atlantic City due to the illness of his grandmother. However, during his residency in Atlantic City, relator had had several minor brushes with the law, and was on juvenile probation at the time of the crime.

About 10:30 a. m. on April 6, 1963, officers of the Special Investigation Squad called at the home of the petitioner's aunt, with whom Bishop was staying, and informed her that they desired to question the petitioner. Relator was told the same thing. His reaction was "So I said O.K. I got my hat and coat and they told me to go in the car." No information concerning relator's whereabouts was communicated to his aunt until the police returned to her home late on the evening of the same day after the petitioner had signed a confession.

After a short drive in the neighborhood, relator was taken to the headquarters of the Special Investigation Squad at 22nd Street and Huntington Park Avenue, where he was questioned for 20 or 30 minutes, during which time he denied any knowledge of the deceased girl. He was then left alone to reflect upon the story he had just given. After 15 or 20 minutes of reflection, questioning was resumed, followed by further intervals of meditation, etc., for about an hour and a half. Relator was given, or at least offered, lunch. Intermittent questioning continued as before, until 2:15 or 2:30 p.m. when the relator was transferred to the headquarters of the Homicide Squad at 8th & Race Streets.

While in transit, the relator was handcuffed.

Upon arrival at Homicide Headquarters at 3:00 p.m., relator was questioned by Detective Goldschmidt, accompanied by two or three other detectives. After about 10 minutes, relator made his first inculpatory statement. He was then left alone for a while, and was fed a doughnut and soft drink, while the police conferred among themselves. He was questioned further from 4:45 p.m. to 5:20 p.m., when the process of taking a written statement was commenced. The written statement was completed and signed at about 7:30 p.m. Then, after refusing to eat, the relator was taken to his aunt's house and obtained certain articles of clothing which were later admitted in evidence against him; during this visit relator's relatives first learned of the nature of the charges.

 The test to be applied is whether upon examination of the totality of the circumstances the "behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." Rogers v. Richmond, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). In pre-*Escobedo-Miranda* cases, such as this, it is also appropriate to consider the absence of any warnings relating to the right of counsel and the right to remain silent. Darwin v. Connecticut, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968); Davis v. North Carolina, 384 U.S. 737, 86 S. Ct. 1761, 16 L.Ed.2d 895 (1966). However, the Supreme Court has made it clear that a confession is not necessarily involuntary merely because a confession results from police interrogation, and the pressures inherent in this process. Culombe v. Connecticut, *supra; see also,* Developments-Confessions, 79 Harv.L. Rev. 935, 974 (1966).

 This case does not present an instance of the abhorrent police practices which have been found in frequently-cited cases reaching the Supreme Court. *See e.q.,* Davis v. North Carolina, *supra;*

Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). Moreover, we are not dealing with a case in which the accused was subjected to an extended period of incommunicado detention and relentless interrogation as was found in Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Davis v. North Carolina, *supra,* or Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944). On the other hand, however, Mr. Bishop's sub-par intelligence, youth and lack of experience are important factors. Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325, 87 A.L.R.2d 614 (1962); Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957).

Petitioner contends that his confession was motivated in part by his hunger and fatigue at the time his written confession was signed. Although the record reveals that relator had not had a full meal since the evening before, I am not persuaded that hunger was a substantial factor in his actions. Nor was fatigue: he had arisen at 10:30 a.m. and completed his confession by 7:30 p. m.

As is typical in cases involving police interrogations, there was conflict in the testimony at trial and in this Court concerning the actions of the police. Suffice to say, I find that at some point during his detention at the Homicide Division the relator's hat was snatched from his head by a police officer, and that he was told that the likelihood of receiving the death penalty was reduced when suspects cooperated with the police.

Against this background, another salient fact must be considered. Within 10 to 15 minutes of his arrival at the Homicide Division the relator made his first admission of complicity in the crime. I am satisfied that as soon as the police disclosed the fact that a witness had seen a young male fitting his description with the decedent just before her death, the petitioner decided that it was in his

best interest to reveal the facts from his own viewpoint.

More importantly, the factor which most strongly militates in favor of a finding of voluntariness in this case is the generally exculpatory nature of the confession, considered in light of the petitioner's knowledge of the strength of the independent evidence against him. In his confession, Bishop related that both he and the decedent had been drinking; she had willingly engaged in sexual relations with him; an altercation arose which resulted in each person striking the other; and the strangulation was accidental.

 Viewing the totality of the circumstances, I am convinced that, more probably than not, the relator's confession was "voluntary." *Cf.* Boulden v. Holman, 385 F.2d 102 (5th Cir. 1967), aff'd in part, vacated and remanded, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969). It must be remembered that the Commonwealth is not required to prove that the petitioner was delighted to confess: it is enough to show that the decision to do so was his own voluntary act, and not the product of improper police conduct.

### Exhaustion

Of the remaining two grounds for relief, the perjury of a witness for the Commonwealth and the introduction of allegedly illegally seized physical evidence, the record is clear that the former has never been raised in the state courts and, therefore, cannot be considered by this Court at the present time. 28 U.S.C. § 2254.

The seizure issue was not raised in the post-trial motions, and was not mentioned by the state appellate court. The district attorney represents that it was not raised. The only reference to it in the post-trial record is a perfunctory comment in the opinion of the trial judge. Under all of the circumstances, I conclude that the petitioner has not met his burden of proving exhaustion of state remedies on either of these grounds, both of which raise serious issues which the state courts should have an opportunity to consider.

### ORDER

And now, this 5th day of February, 1970, it is ordered

1) That, on all issues relating to the trial use of relator's confession, the petition is denied.

2) That, as to the issues relating to the alleged perjury of a witness and the search and seizure issues, the petition is dismissed without prejudice, for failure to exhaust state remedies.

There is probable cause for appeal.