**UNITED STATES of America**

v.

**Raul Perez DEGOLLADO a/k/a Alejandro Reyes a/k/a Joe Nieves.**

**Cr. No. L–88–220.**

United States District Court,
S.D. Texas,
Laredo Division.

July 28, 1988.

Jeff Babcock, Asst. U.S. Atty., Laredo, Tex., for the government.

Ralph De Guerin, Houston, Tex., for defendant.

## ORDER

KAZEN, District Judge.

Defendant moves to dismiss the indictment against him, alleging reprehensible conduct on the part of American law enforcement agents. Specifically, Defendant alleges that American agents requested and approved the physical torture of Defendant in Mexico by Mexican police. Extensive evidentiary hearings have been held on this motion.

█ Defendant's motion is grounded on a series of decisions originating with *United States v. Toscanino*, 500 F.2d 267 (2nd Cir.1974). While the *Toscanino* opinion painted with a rather broad brush, its relevant holding is that a federal court must "divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." 500 F.2d at 275. Subsequent Fifth Circuit opinions have questioned whether and to what extent *Toscanino* is the law in this circuit. The Fifth Circuit has at least assumed that under certain circumstances, governmental conduct may be so outrageous as to justify dismissal of the indictment, although the parties have not cited nor has the Court found any case actually granting that relief. *See, e.g., United States v. Herrera,* 504 F.2d 859 (5th Cir.1974); *United States v. Winter,* 509 F.2d 975 (5th Cir.1975); *United States v. Postal,* 589 F.2d 862 (5th Cir.1979). The latest decision in this line is *United States v. Wilson,* 732 F.2d 404 (5th Cir.1984), where the court indicated "that unless the government conduct in securing custody of the defendant is shocking and outrageous, the court should not dismiss the indictment on a due process basis." 732 F.2d at 411. Apart from that narrow exception, it has been described as the "well-established law of this circuit" that a defendant in a federal criminal trial, whether citizen or alien, whether arrested within or beyond the territory of the United States, may not successfully challenge the court's jurisdiction over his person on the grounds that his presence was unlawfully secured. *United States v. Toro,* 840 F.2d 1221, 1235 (5th Cir.1988).

█ Assuming the continued viability of the *Toscanino* doctrine, it not only requires outrageous and shocking conduct, but also some degree of involvement by the United States Government. How much involvement is debated by the parties and is not entirely clear. As indicated above, the *Tos-*

**1138**

*canino* decision itself spoke of this government's "deliberate, unnecessary and unreasonable invasion" of the defendant's rights. It is noteworthy that upon remand from the Second Circuit, the district court in *Toscanino* refused to dismiss the indictment and declined to even grant an evidentiary hearing. The court held that Toscanino's eleven-page affidavit made "no claim of participation by United States officials in the abduction or torture of the defendant" nor did it provide "any evidence which shows that the abduction was carried out at the direction of United States officials." *United States v. Toscanino*, 398 F.Supp. 916, 917 (E.D.N.Y.1975). In *Birdsell v. United States*, 346 F.2d 775 (5th Cir.1965), a pre-*Toscanino* decision, the Fifth Circuit held that the Fourth Amendment was "inapplicable to an action by a foreign sovereign in its own territory in enforcing its own laws, even though American officials *were present and cooperated in some degree.*" 346 F.2d at 782 (emphasis added). In a footnote, the court suggested a contrary result might obtain if federal officials "induced" foreign police to engage in shocking conduct. *Id.* at f. 10. In *United States v. Lara*, 539 F.2d 495 (5th Cir.1976), the court held that "even if" *Toscanino* applied in this circuit, the defendant could not successfully attack jurisdiction where United States agents "played *no direct role* in the torture allegedly administered by the Panamanian authorities." *Id.* (emphasis added). In *Stonehill v. United States*, 405 F.2d 738 (9th Cir.1968), the court held that the Fourth Amendment did not apply to raids by foreign officials unless United States agents "substantially participated in the raids *so as to convert them into joint ventures between the United States and the foreign officials.*" 405 F.2d at 743 (emphasis added).

Defendant's motion alleges that he was tortured "at the direct order and approval of American law enforcement agents." He further asserts that his initial period of torture lasted four hours in a hotel room and then continued throughout various places in Mexico for the next two weeks. He alleges that during these times "American law enforcement agents were present and approved of and even requested the continuation of defendant's torture." The evidence fails to support these allegations.

This case is based upon the seizure near Hebbronville, Texas of a vehicle containing approximately 237 pounds of cocaine. Prior to the stop of this vehicle, there was apparently extensive surveillance of various individuals in the Laredo, Texas area for a period of at least 24 hours. Many photographs were taken and have been produced for discovery. This Defendant was allegedly seen on several occasions during the surveillance. After the contraband was found, the other Defendants were arrested. One of them, Atelberto Carlon–Salgado, gave statements detailing this Defendant's role in the cocaine conspiracy. Meanwhile, the Defendant had crossed the international boundary into Nuevo Laredo, Mexico, where he was traced to a particular hotel.

DEA Agent Kuykendall solicited the assistance of the Mexican federal judicial police to arrest the Defendant and deliver him to the DEA agents. Kuykendall went to the hotel with a Mexican commandante and there joined several other Mexican police officers. Kuykendall was also joined by Kenneth Maxwell, a sergeant with the Texas Department of Public Safety, DEA Officer Lugo and DPS Officer Whitley.

The Mexican police entered the hotel room first, followed shortly thereafter by the four Americans. Eventually, the Defendant was placed on the bed with his hands bound behind him. He was being held down by several Mexican officers. The Mexican officers began to interrogate the Defendant while periodically spraying seltzer water in his nose. Defendant claims that after about 45 minutes, he was blindfolded and then subjected to long periods of torture by electrical prod. He insists that at some point, the Mexican police switched to a more powerful electrical device and told him that this device had been furnished by the American agents. He further insists that at least some American agents were in the hotel room for up to four hours, during the entire period of torture. Interestingly, after the first 45 min-

utes, he claims that he only saw one American. He described this individual and indicated that the person never said anything but sat near the bed as if listening intently to the entire interrogation. The only American which the Defendant could identify was Agent Kuykendall. He indicated that he did not see Kuykendall after the first 45 minutes but insists that he could hear his voice in the background throughout the rest of the evening. The voice would not speak to the Defendant, but would be conversing with other Mexicans.

Agent Lugo testified that he and Whitley were only in the hotel room for approximately 15 minutes. Their only function was to confirm that the Defendant was the same person seen by them during the earlier surveillance in Laredo. At that time the Defendant was known to the agents only as "Joe Nieves." Lugo and Whitley promptly left and returned to Laredo, Texas for other duties on the case. This testimony was confirmed by Sergeant Maxwell and not disputed by the Defendant. The Defendant testified that he never saw Lugo in the hotel. Moreover his description of the other American he claims to have seen does not remotely match the undisputed description of Officer Whitley.

Kuykendall and Maxwell both estimate that they left the hotel scene within 45 minutes. Their sole purpose in going to Mexico had been to obtain the person of this Defendant. Their objective was foiled when this Defendant insisted to the Mexican authorities that he was a Mexican national named Raul Perez–Degollado and furnished identification to support that claim. Believing that they now had in their custody a suspected cocaine trafficker who was a Mexican national rather than a Colombian, the Mexican police refused to surrender him and commenced their own investigation. While the Mexican police had begun the seltzer treatment before the American agents left, the Court finds that this was not done at the request or under the direction of the American agents nor were the American agents conducting the questioning of this Defendant directly or indirectly. In fact, the beginning of the "rough" treatment was what prompted Kuykendall and Maxwell to leave. As Maxwell candidly put it:

"It was getting plenty rough. It was something that I was not accustomed to. It scared the fire out of me and we left. Not only did we leave, we left afoot and we walked some 10 to 15 blocks back to the Mexican Federal Judicial Police Headquarters to get Mr. Kuykendall's vehicle and then we drove across."

While this conduct may not have been heroic, it is not tantamount to deliberately participating in the activities of the Mexican police.

The Court rejects the testimony that the American agents stayed in the hotel room for several hours. That testimony by the Defendant is not only contradicted by Kuykendall, Maxwell and Lugo, is also contradicted by the computer record that Kuykendall's vehicle crossed back into Laredo that morning at 1:53 a.m. The Court finds that no American agent was present at or participated in any torture with an electrical device and that no American agents ever supplied such a device to the Mexican police. After the hotel episode, this Defendant stayed with the Mexican police for some four weeks. The investigation commenced by the Mexican authorities apparently took them to Saltillo, Monterrey and Mexico City. Defendant says that for the first ten days, but not thereafter, his torture continued. Contrary to Defendant's allegations, no American agents were ever present during any of this time and no American agents requested, directed, or authorized any abuse of the Defendant during this time. The evidence that Mexican commandante Tinoco may have ignored a Mexican court "amparo" during the course of Defendant's detention in Mexico does not prove that he or his subordinates were acting as American agents. In fact the evidence shows that the DEA was essentially in the dark about this Defendant. DEA agents were periodically told that the Mexicans were continuing their investigation in various locales, but no other details were furnished.

The final incident of physical abuse described by Defendant allegedly occurred an

hour before the Defendant was surrendered to American authorities at the international bridge on May 31, 1988. He claims that he was struck on various parts of his body. Allegedly the Mexican authorities described this treatment as a "goodbye kiss," telling Defendant that the purpose was to insure that he cooperated with the DEA agents once he arrived in Laredo. Assuming that testimony is true, there is again no evidence to suggest that the DEA agents requested, directed or authorized such conduct.

In essence, the evidence shows that at no time from the initial apprehension of this Defendant in the hotel room on May 4 until his surrender to American authorities on or about May 31 did any American agent interrogate him or touch him, nor direct or request any Mexican police to do so. Only four American agents were ever involved in this episode, two only momentarily. The Court further finds that the remaining two agents were in the Defendant's hotel room on the first evening for approximately 45 minutes, during which time they did witness the Mexican police beginning to use the seltzer water treatment as a method of interrogation. They did not witness nor did they have any involvement with any use of electrical torture devices. They left because they saw that the interrogation was beginning to take a "rough" turn, and also because it became clear that the Mexican police were not going to surrender the Defendant. Defendant argues that despite the lack of any direct involvement on the part of American agents, they must be held liable for the conduct of the Mexican police because they originally sought the arrest of this Defendant and therefore began the chain of events that led to the conduct in question. The Court is not satisfied that this is the type of "deliberate" conduct sufficient to invoke the *Toscanino* doctrine. Indeed in *United States v. Lira*, 515 F.2d 68 (2nd Cir.1975), decided by the Second Circuit just a year after its *Toscanino* decision, that court specifically rejected an argument that the United States Government was "vicariously responsible" for a defendant's torture because it requested that he be arrested and expelled from Chile and had "placed the matter in motion." 515 F.2d at 71.

The American agents clearly were involved with the Mexican police to the extent of attempting to apprehend this Defendant and have him delivered to the United States. The joint activity ended when this Defendant denied being a Columbian and claimed to be a Mexican citizen. At that point, the Mexican police initiated their own investigation and refused to surrender this Defendant for almost a month. This was not at the request or instruction of the American agents and in fact was contrary to their wishes. The agents were already holding over 200 pounds of cocaine together with other presumptively admissible evidence of guilt on the part of this Defendant. The agents surely knew that any statements or other evidence produced by torture from a defendant in Mexico would be worthless in an American court. For that matter, evidence produced by this Defendant to Mexican authorities in Mexico under any circumstances would be of questionable tactical value in this trial. Moreover there is no clue as to how the investigation of this case in Saltillo, Monterrey, and other parts south would have been of any value to this case.

This is not a motion to suppress. Were it so, the Court would not hesitate to prevent the United States Government from using evidence produced under these circumstances by Mexican authorities, even though American agents did not authorize or direct the misconduct. However, the Defendant seeks more than suppression of evidence. He seeks complete dismissal of the charges pending against him. For other violations of the Fourth, Fifth and Sixth Amendments, the Supreme Court has expressed the general rule that the remedy should be tailored to the injury suffered from the constitutional violation without unnecessarily infringing upon competing interests, including society's interest in the administration of criminal justice. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981). The Court concludes that the facts of this case do not warrant outright dismissal of the indict-

ment against this Defendant. The motion is DENIED.