NO. 07-08-0315-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

DECEMBER 30, 2009
_____

ANTHONY G. HEREFORD, JR.,

Appellant

v.

THE STATE OF TEXAS,

Appellee
_____

FROM THE 140TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2007-416,858; HON. JIM BOB DARNELL, PRESIDING
_____

*Opinion*
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

### *Background*

One thousand-one, one thousand-two, one thousand-three, one thousand-four, one thousand-five, one thousand-six, one thousand-seven, one thousand-eight, one thousand-nine, one thousand-ten, one thousand-eleven, one thousand-twelve, one thousand-thirteen, one thousand-fourteen, one thousand-fifteen, one thousand-sixteen, one thousand-seventeen, one thousand-eighteen, one thousand-nineteen, one thousand-

twenty. That was the amount of time Officer Arp initially tased Anthony G. Hereford, Jr., according to the instrument's log. At the time, appellant was handcuffed and being held down in a hospital emergency room. Arp wanted appellant to spit-out what he had in his mouth. When appellant did not comply after Arp's first foray, the tasings resumed. No one viewed appellant as a threat to others during the episode. Nor had he attacked anyone. Arp simply wanted appellant to comply. When asked if "repeated taser use [was] acceptable" and whether "20 seconds worth of tasering" was "okay," the policeman answered "yes" to both.

Arp was not the first to tase appellant, though. Officer Williams had already done so twice at a locale miles away from the hospital. He too wanted appellant to remove the items, which Williams thought to be drugs, from his mouth, and met with no success. So, Williams decided to take appellant to the hospital in effort to gain medical assistance.

In continuing where Williams had failed, Arp said he administered all but one of the electrical shocks to Hereford's inner thigh region; others saw them being administered to appellant's "groin area."[1]

Finally, Arp reported seeing Officer Holmes, who also was present in the emergency room, tase appellant at least once. Holmes denied this, though. So, by the time the incident ended and within a span of about an hour, appellant was potentially shocked eleven times.

Anthony G. Hereford, Jr. now appeals his conviction for possessing a controlled substance with intent to deliver. Several issues before us involve the trial court's decision

---

[1]Apparently, Arp used the taser on appellant's arm or upper body to force him to release items held in his hand.

2

to deny appellant's motion to suppress. Others involve the trial court's refusal to permit expert testimony on whether the acts undertaken by the officers were excessive and to submit an article 38.23 instruction. Finding harmful error, we reverse the trial court's judgment.

### *Issue One – Warrants Not Admitted into Evidence*

Appellant initially contends that the trial court erred in overruling his motion to suppress because the State failed to tender into evidence the arrest warrants upon which Officer Williams acted. We overrule the contention.

Next, appellant is quite correct in arguing that the State was obligated to tender the arrest warrant and affidavit supporting its issuance into evidence when the arrest is based upon a warrant. *Paulea v. State,* 278 S.W.3d 861, 864 (Tex. App.–Houston [14th Dist.] 2009, pet. ref'd). That was not done here. Nonetheless, Officer Williams testified at the suppression hearing that about a week before the arrest he saw appellant driving his car without a front license plate. Knowing this to be a traffic violation, *see* TEX. TRANSP. CODE ANN. §502.404(a) (Vernon Supp. 2009) (requiring a vehicle to carry a front license plate), the officer directed appellant to pull over. Appellant allegedly said "no" and drove off. Because the officer was on bike patrol at the time, he could not give chase. Yet, the officer concluded that appellant evaded arrest by driving away, and that portended the commission of a criminal offense. TEX. PENAL CODE ANN. §38.04(a) (Vernon 2009) (stating that a person commits an offense if he intentionally flees from a person he knows is a peace officer attempting lawfully to arrest or detain him). This testimony is of import because a peace officer may arrest someone without a warrant for any offense committed in his presence or within his view. TEX. CODE CRIM. PROC. ANN. art. 14.01(b) (Vernon

3

2005).  That the offense may have occurred sometime earlier does not affect the authority granted under art. 14.01(b).  *Akins v. State,* 202 S.W.3d 879, 889 (Tex. App.–Fort Worth 2006, pet. ref'd) (holding that an officer may make an arrest under art. 14.01(b) for a crime committed at an earlier time); *accord, Herrera v. State*, No. 13-05-102-CR, 2006 Tex. App. Lᴇxɪs 10647 (Tex. App.–Corpus Christi, December 14, 2006, pet. ref'd) (not designated for publication) (holding the same).   Given this, we conclude that a reasonable officer presented with the circumstances confronting Williams would have been justified in arresting appellant at the motel despite the absence of a warrant.  *See Amador v. State,* 275 S.W.3d 872, 878 (Tex. Crim. App. 2009) (holding that determining whether an officer had probable cause to arrest is an objective test based upon the totality of the circumstances).   This, in turn, means that the trial court did not abuse its discretion in concluding that appellant's initial arrest was lawful even though the arrest warrants were not offered into evidence.

### *Issue Two – Reasonableness of the Search and Seizure*

Appellant next contends that the evidence of drugs upon which his conviction was based should have been suppressed given the manner in which it was obtained.  He believed it to be unreasonable, excessive, and a violation of due process.  The trial court rejected the argument but why it did went unexplained.  We sustain the issue.

One need only harken back to first year constitutional and criminal procedure class to recall our United States Supreme Court stating:  "[i]t has long since ceased to be true that due process of law is heedless of the means by which otherwise relevant and credible evidence is obtained."  *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 210, 96

4

L.Ed.183 (1952). In *Rochin*, the police transported a suspect, who they thought swallowed drugs, to the hospital to undergo the non-consensual pumping of his stomach. This was done after their attempts to physically force Rochin to open his mouth met with no success. *Id.* 342 U.S. at 166, 72 S.Ct. at 206. According to the Court, recognizing the use of "brutal conduct" as a legitimate means of securing evidence is tantamount to "afford[ing] brutality the cloak of law." *Id.* 342 U.S. at 173, 72 S.Ct. at 210. And, most importantly, it opted against that by viewing the police conduct as a denial of due process. *See Brown v. State of Mississippi*, 297 U.S. 278, 287, 56 S.Ct. 461, 465-66, 80 L.Ed. 682 (1936) (holding that whipping or beating of a suspect to gain his confession violated due process).

Years later, in *Winston v. Lee*, 470 U.S. 753, 755, 105 S.Ct. 1611, 1614, 84 L.Ed.2d 662 (1985), the Supreme Court was asked to consider whether more than due process is implicated when evidence is secured through forceful means. It recognized that such conduct may also run afoul of the Fourth Amendment to the United States Constitution. Whether it did depended upon the consideration of such indicia as whether the procedure utilized by the police 1) threatened the suspect's health or safety, 2) conformed to accepted medical practices, 3) was performed by a trained professional, 4) arose from the existence of probable cause to believe the suspect had evidence of a crime, 5) unduly intruded upon the individual's dignitary interests in personal privacy, and 6) was commonplace of one to which individuals were often subjected. *Id.* 470 U.S. at 761-63, 105 S.Ct. at 1617-18. So too must the community's interest in accurately determining one's guilt or innocence and the State's need for the evidence be weighed. *Id.* 470 U.S. at 762-67, 105 S.Ct. at 1617-20. Given that various indicia must be considered, there was

5

and is no bright line rule resolving all situations; instead, the courts are to resolve the matter case by case. *Id.* 470 U.S. at 760, 105 S.Ct. at 1616.

We read the foregoing authority to require our public servants to comply with particular standards of conduct and consciousness when performing their duties. Under the umbrella of public servant walk policemen, and the standard applicable to their conduct when gathering evidence of criminal activity is one of reasonableness. In other words, law enforcement personnel must act reasonably when conducting searches and seizures. That finds expression in the Fourth Amendment. Through it we are told that the "right of the people to be secure in their persons, houses, papers and effects, against *unreasonabl*e searches and seizures shall not be violated." U.S. CONST. amend. IV (emphasis added). This very concept is reiterated by the Court of Criminal Appeals decision in *Hernandez v. State*, 548 S.W.2d 904 (Tex. Crim. App. 1977). When asked whether physical force could be used to obtain evidence, it said yes but limited the measures utilized to "reasonable" ones, which may include "reasonable physical contact." *Id.* at 905.

But, should the acceptable standards of conduct be breached, then the judiciary must intervene to remedy the violation. The corrective action available includes suppressing the evidence obtained via the unacceptable procedure. Indeed, it was the Supreme Court's concern about an individual's "freedom from all brutish means of coercing evidence," as well as the freedom from "state invasions of privacy" that eventually caused it to apply the exclusionary rule to Fourth Amendment violations committed by state authorities. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961).

6

One other preliminary matter bears comment. It involves the burden of proof and the litigant responsible for carrying it. When an arrest or search is undertaken without a warrant, the burden to show its legitimacy lies with the State. *Amores v. State*, 816 S.W.2d 407, 413 (Tex. Crim. App. 1991). As mentioned under issue one, the State failed to prove that the arrest and search of appellant were undertaken per a valid warrant. Thus, it had the burden to prove that the seizure by the officer at bar was reasonable. With that, we turn to the record before us.

As previously mentioned, no one accused appellant of being violent or physically aggressive towards anyone throughout the incident. Of the witnesses asked about it and who were present, none said that they felt threatened by him.[2] The record further illustrates that though appellant would not voluntarily remove the items from his mouth, his effort to keep his teeth clenched, his shaking his head, and his screaming and moaning[3] began after the officers endeavored to physically extract him from the squad car, applied some throat hold on appellant, thrust him against the trunk of their police unit, tased him on the back and leg, and eventually "pulled" him to the ground. This was done while appellant's hands remained cuffed behind his back. With regard to the aforementioned throat hold, Officer Williams denied that it consisted of punching appellant. Rather, it

---

[2]A physician did state that he feared having his finger bitten if he placed it in appellant's mouth. However, we are cited to nothing in the record upon which one could reasonably deduce that appellant would have done so or that appellant sought to harm anyone. This same doctor also testified that appellant flailed his hands while being forced to expel the items from his mouth. Yet, according to the officer who arrested appellant, the latter had his hands cuffed behind his back before being taken to the emergency room and that appellant remained cuffed. How one can flail his hands while they are cuffed behind his back is an event difficult to picture.

[3]Because of appellant's refusal to spit out the substance, the officers deemed him "non-compliant." The latter was a buzzword often used by the officers here when describing appellant's behavior and justifying their response to it. What that rather amorphous term meant was that appellant would not follow their orders to spit it out.

7

purportedly encompassed the application of "pressure points" which eventually converted to "grabbing" appellant's throat "pretty sternly," according to the officer.

Realizing that their efforts were for naught and that appellant remained "non-compliant," the policemen at the scene returned appellant to the back seat of the squad car and began debating what to do next. When asked why they thought it permissible to engage in this discussion and risk the attendant delay, Williams told the trial court that he was "not totally convinced that [appellant] swallowed [the item] as much as he's just continuing to hold it in his mouth."[4] That very same officer also knew that crack cocaine (*i.e.* the substance he believed appellant had) would not dissolve if simply kept in one's mouth. This testimony coupled with the fact that appellant continued to retain the drug in his mouth after being pulled from the squad car, grabbed by the throat, "pulled" to the ground and tased twice hardly suggests that he sought to swallow or otherwise destroy the contraband.[5]

Once appellant arrived at the hospital, the tasing resumed. This was so despite the method having achieved little success in the field. But rather than focus upon the locations selected by Williams, Arp consciously opted for a "sensitive" one. That location, according to Arp, was appellant's upper, inner thigh, and there the tasing began anew. Yet, Williams described seeing Arp apply the weapon to appellant's "groin area" even though officers

[4]This deduction appeared rather reasonable given appellant's conduct once the items were removed from him. He grew calm and ceased his "non-compliant" behavior. Why we mention this is because the officers attempted to attribute appellant's flailing about, screaming and moaning as the effects of having ingested the narcotic they thought was in his mouth. Yet, if he grew calm "immediately" after the drugs were extricated and the tasing and other physical exertion undertaken by the police and medical personnel at the hospital stopped, we are left to wonder whether his conduct was less a result of ingesting drugs and more of a response to being tased and physically manhandled.

[5]That the contraband stayed in his mouth until being forced to excrete it at the hospital further confirms this.

8

purportedly were trained (by Williams and others) to avoid "the private areas." What was meant by the "private area" is unknown though Williams conceded that the areas which officers were prohibited from tasing included the "groin." Other than this, though, we have nothing before us about the extent of the taser training generally received by the police or policies adopted by the police department regarding taser use. So, the State effectively failed to establish that the conduct of both Williams and Arp comported with accepted practice.

Next, Williams described the tasing method applied here as "drive stun."[6] Being drive stunned was "less violent" than being punched, kneed or struck with an asp, said the officer. That nonetheless does not mean much. A bat may be "less violent" than a bullet, yet both can cause grave injury or death. So, saying that the shock emitted from a taser is "less violent" than being hit with a fist, struck with a knee, or beat with a steel baton fails to allow one to reasonably gauge the actual amount of violence actually utilized. Indeed, there may be situations wherein being tased is as egregious as being struck with a baton depending upon the location of the blow.

That it may be "less violent" also falls short of illustrating that the measure has a reduced likelihood of inflicting severe pain or injury. Indeed, Williams conceded that being shocked with the weapon "doesn't feel great" and that it inflicted pain, though the pain

---

[6]According to the record, a taser could be used by firing darts or electrodes into the target. The darts were attached to the taser itself via wires. Depressing the taser's trigger would allow voltage to travel down the wires, through the darts, and into the target. "Drive stun," however, did not require the officer to fire darts. It simply consisted of touching the taser's two electrodes to the target and pulling the trigger. The latter method obligated the officer to be much closer to the target, and the eventual shock normally affected a much smaller area.

9

stopped once the electrical charge ended.[7]  This may be why he agreed with defense counsel's characterization of tasers as "pain compliance" devices.  And, though he opined that "the taser alone has never actually killed anyone," Williams acknowledged that not only that it "may have been involved in an incident where an individual died," but also that "there is always a risk of death" when using it.  Moreover, another witness, who happened to be a physician present in the emergency room as Arp tased appellant, answered "yes" when asked if he had heard of tasers "hurting anybody, killing anybody."  The same witness also 1) recalled that appellant would "scream" when tased, 2) opined that the procedure "seemed painful," and 3) related how appellant "was very frantic, because there was tasing there in the ER . . . ."  A nurse in attendance at the time also observed appellant's screams and appearance of being in pain when tased.  That tasing via drive stun could also leave scars and burns was also disclosed.  And, while Williams may believe that the pain ends once the electricity stops flowing, one may nonetheless suffer scars or burns thereafter.  Finally, logic would suggest that if the pain inflicted by the taser was as minimal as Williams attempted to describe, the police department would not deem them very effective or useful.  Yet, they are being readily used to effect, as illustrated here.

Additionally, that the weapon is known to inflict pain, is used for that purpose, "always" involves the risk of death, and can burn flesh falls short of establishing it as a nominal affront to human dignity and personal security.  This is so even though it may be

---

[7]At one point, an officer compared the pain felt from a taser to the instantaneous sting of static electricity.  Apparently, he did so in effort to minimize its quantum.  Yet, most know from experience that being shocked by static electricity can be so unpleasant as to stimulate expletives to pass one's lips.  Now, multiplying that one shock of fractional duration by the number that would be experienced in the twenty-second period that Arp initially tased appellant cannot but lead one to conclude that Williams was correct in saying the event would "not feel great."

"less violent" than a clubbing. Nor is it of much consequence that no one recalled specific instances of a taser "actually" killing its victims. Far less is needed before a practice is considered unreasonable. *See, e.g. Dominguez v. Moore*, 149 Fed. Appx. 281, 283, No. 04-41382, 2005 U.S. App. LEXIS 21337 at *3 (5th Cir. 2005) (not designated for publication) (holding that the refusal to loosen handcuffs constituted unreasonably excessive force because plaintiff's hands became "grossly swollen" and resulted in permanent scarring and nerve injury).

Also problematic is the manner in which the police at bar viewed use of the pain-inflicting device. Those officers who were asked saw no problem with "continuously" or "repeatedly" discharging a taser on individuals within their custody but who were "non-compliant." Furthermore, non-compliance could include someone's mere refusal to do that asked of him, according to one officer. It was this very attitude that Arp exemplified in the emergency room when shocking appellant either the four times to which he admitted or to the eight times indicated by the taser's log. He also was ready to continue if need be, given his representations to appellant. It must be remembered that this representation and accompanying conduct arose 1) after Williams found the taser ineffective and opted to try something else and 2) while appellant was both handcuffed and held down. Whether this comported with accepted departmental practice is unknown. Nonetheless, the lack of concern about repeatedly tasing someone deemed "non-compliant," coupled with the four to eight tasings administered by Arp, the two by Williams, and the one which Arp accused Holmes of administering evince a rather cavalier attitude towards the use of a weapon known to inflict pain, cause burns, and "always" involves the risk of death.

11

Next, feeling the instantaneous sting of static electricity may be a common, everyday happenstance. However, being subjected to 50,000 volts of electricity for twenty seconds or more is not, and the State proffered no evidence suggesting otherwise. Simply put, the procedure before us is not one that is part of ordinary life like that in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (the drawing of blood). Indeed, it is unlikely that more than most will ever experience it in these United States.

Regarding the matter of probable cause, appellant was under arrest when the search and seizure began. Thus, the officers had the authority to search his person. *See McGee v. State,* 105 S.W.3d 609, 615 (Tex Crim. App. 2003) (holding that a person may be subjected to a search incident to his arrest). Furthermore, it is rather unquestionable that State and its law enforcement representatives have an interest in securing and preserving evidence of a crime. *Id*. Yet, the privilege to search and seize is not an invitation for the officer to do whatever he chooses. Again, the conduct must be reasonable. *Hernandez v. State, supra*. So there are limitations.

That the State and community have an interest in prosecuting individuals involved in the drug trade is also beyond reasonable dispute. But here, appellant was already subject to arrest and prosecution for other crimes. They included the crime of evading arrest committed by appellant a week or so earlier or the crimes underlying the supposed arrest warrants upon which Williams initially arrested appellant. And, though securing the drugs from appellant was needed to prosecute the crime at bar, the State failed to illustrate that their loss or destruction was imminent or even probable. Again, no one questions that appellant had already held the substances in his hand and mouth for some time before

12

they were forcibly removed. He did this even though previously having his throat "sternly" grabbed, being thrown to the ground, being tased in the field, and being held down and tased multiple times in the hospital. Had appellant intended to swallow, dispose, or destroy the drugs, common sense suggests that he would have done so rather than risk the effects of physical force.

More importantly, no evidence of record suggested, much less illustrated, that the drugs appellant clutched in his hand were imminently subject to being swallowed or lost. So too should it be mentioned that Officer Williams had already decided against further tasing and opted to seek medical help instead. Though the record indicates that some effort was undertaken by medical personnel to have appellant expel the drugs (*i.e.* forcing implements into his mouth and exposing him to ammonia capsules), the State did little to negate the chance that other reasonable but less painful medical options were available.

Of course, it is easy to say that the weapon ultimately proved effective. So too would a cane and club be effective if used enough times. The problem, however, is that our United States Supreme Court condemned beatings and whippings as a means of obtaining evidence. *Brown v. State of Mississippi*, 297 U.S. at 285-86, 56 S.Ct. at 465. Given that those measures and the application of a taser are founded upon the concept of compliance through pain and the rather accurate premise that the more inflicted the greater the chance of compliance, it would be reasonable to view two modes of obtaining evidence as alike. Additionally, both can be quite brutal depending upon the manner of and circumstances surrounding their application.

Had the conduct before us encompassed only Williams' initial application of a hold upon appellant's throat then the debate would be less complicated. This is so because

13

authority recognizes that the administration of a choke hold may be reasonable to prevent one from swallowing evidence. *Hernandez v. State, supra*; *Lewis v. State*, 56 S.W.3d 626, 628-29 (Tex. App.–Texarkana 2001, no pet.). Moreover, at least one court thought tasing a suspect several times immediately after arrest was non-excessive when he had tried to escape, had lunged at the officers, had actually began chewing and swallowing the drugs hidden in his mouth, and physically resisted the officers' efforts to have him spit out the substance. *Ellis v. Columbus City Police Dep't.*, No. 1:07CV124-A-A, 2009 U.S. Dist. LEXIS 95821 (N.D. Miss. September 15, 2009). Yet, we had more here. Admittedly, the situation at bar would liken to *Ellis* had Williams alone tased appellant. But, Arp joined in long after the arrest. Furthermore, our situation involved a controlled hospital environment whereat trained medical personnel stood ready to help if appellant swallowed the drugs. That was missing in *Ellis* for the officers were in the field and actually saw appellant begin to swallow the drugs. There they had little choice but to react. Nor do we have before us an individual who attempted to escape or tried to assault the officers, as in *Ellis*. Also missing from that case is evidence that the officers intentionally selected the rather sensitive "groin area" as their target of choice and administered possibly eleven tasings.

The absence of evidence regarding the extent of taser training, if any, completed by those given tasers at bar, the police department's policy, if any, regulating the use of tasers, whether the conduct of Williams and Arp comported with both their alleged training and department policies hinders our ability to assess the reasonableness of force in question. Whether any other authoritative organization or body implemented guidelines or policies regulating the use of tasers would and whether the conduct of the police at bar complied with them also would have been helpful in determining what a reasonable officer

14

facing the same circumstances presented to Williams and Arp would have done. The extent of Arp's role at the hospital was also pertinent. Did his duty encompass the ability to intervene in medical situations or was he simply there to protect medical personnel from aggressive patients? The answer to those questions could be influential especially since the record clearly illustrates that appellant was not a threat to third parties. Whether Arp was invited by medical personnel to assist or whether he simply interjected himself without affording them adequate opportunity to explore alternatives was also undeveloped. While the medical care initially given appellant proved ineffective that does not mean they had no other reasonable medical options available before Arp resorted to the taser.

Our application of the record to the indicia itemized in *Winston* and policy considerations mentioned in *Brown*, *Rochin*, and *Mapp* leads us to conclude that the State failed to prove that force administered here was reasonable. *See United States v. Degollado*, 696 F. Supp. 1136, 1140-41 (S.D. Tex. 1988) (wherein the court stated that securing evidence through the use of an electrical prod and seltzer water warranted its suppression); *see also Bultema v. Benzie County,* 146 Fed. Appx. 28, 35, No. 04-1772, 2005 U.S. App. LEXIS 17818 at *16 (6th Cir. 2005) (holding that "the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900-01 (6th Cir. 2004) (holding that "it was excessive for police officers to lay on top of a mentally retarded individual who had stopped resisting arrest and posed no flight risk, and spray him with pepper spray even after he was immobilized by handcuffs and a hobbling device"). The trial court erred in

15

holding otherwise.[8]  We further deem the error harmful.  That is, we cannot say beyond reasonable doubt that the evidence secured through the police conduct had no effect on the outcome.  *See* TEX. R. APP. P. 44.2(a) (requiring reversal unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment).

Though other issues were presented by appellant, their resolution is unnecessary to the disposition of this appeal.  Since the cause will be remanded, they can be raised and resolved by the trial court anew.  Accordingly, we reverse the judgment entered below and remand the cause.

Brian Quinn
Chief Justice

Publish.

Campbell, J., concurs in result.

---

[8]It may well be that those guilty often find protection in what some deem to be the "technicalities" created by our constitutions.  Those "technicalities" though exist to protect the innocent as well as to preserve minimum concepts of decency and acceptability in a civilized society.  That the guilty also benefit from them is not reason for their rejection.  Throughout life we are told that we must accept the good with the bad.  This is especially so when the former greatly outweighs the latter as it does here.