NO. 07-07-0093-CR


NO. 07-07-0094-CR


NO. 07-07-0095-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL B



JUNE 5, 2007


______________________________



SABAS RODRIGUEZ, 



 Appellant


v.



THE STATE OF TEXAS, 



 Appellee

_________________________________



FROM THE 64TH DISTRICT COURT OF HALE COUNTY;


NOS. A15790-0411; A15791-0411; B15950-0503; 


HON. ROBERT W. KINKAID, JR., PRESIDING


_______________________________



Memorandum Opinion


______________________________



Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

 Sabas Rodriguez (appellant) appeals three judgments revoking his community
supervision. He was originally convicted of forgery and theft via a plea bargain and
received a sentence of two years in a state jail facility. His sentence was suspended, and
he was placed on probation for five years. Subsequently, the State filed two separate
motions to revoke that probation. The second resulted in its revocation and his
incarceration for two years. Appellant timely noticed his appeal. His appointed counsel
then moved to withdraw, after filing a brief pursuant to Anders v. California, 386 U.S. 738,
87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and representing that he had searched the record
and found no arguable grounds for reversal. The motion and brief illustrated that appellant
was informed of his rights to review the appellate record and file his own brief. So too did
we inform appellant that any pro se response or brief he cared to file had to be filed by May
31, 2007. To date, appellant has filed no pro se response or brief. 

 In compliance with the principles enunciated in Anders, appellate counsel discussed
one potential area for appeal that concerned the sufficiency of the evidence supporting the
trial court's determination to revoke appellant's probation. However, counsel explained
how "the overwhelming weight of the evidence does not appear to require reversal."

 So too did we conduct an independent review of the record to determine whether
there existed reversible error and found none. See Stafford v. State, 813 S.W.2d 503, 511
(Tex. Crim. App. 1991) (requiring us to conduct an independent review). Since no appeal
was taken within 30 days from the date of appellant's guilty plea and original conviction,
we have no jurisdiction over any purported error arising from or prior to the plea hearing. 
Manuel v. State, 944 S.W.2d 658, 661-62 (Tex. Crim. App. 1999); see Cooper v. State, 45
S.W.3d 77, 83 (Tex. Crim. App. 2001). Moreover, appellant pled true to more than a
majority of the grounds upon which the State sought to revoke his probation. Finding any
one ground to exist entitled the trial court to grant the State's motion. Moore v. State, 605
S.W. 2d 924, 926 (Tex. Crim. App. 1979). Finally, the punishment levied was within the
range provided by statute. 

 Accordingly, we grant counsel's motion to withdraw and affirm the judgments of the
trial court.


 Brian Quinn 

 Chief Justice



Do not publish. 



s well as to preserve\
minimum concepts of decency and acceptability in a civilized society. That the guilty also benefit from them\
is not reason for their rejection. Throughout life we are told that we must accept the good with the bad. This\
is especially so when the former greatly outweighs the latter as it does here. \
'

function WPShow( WPid, WPtext )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'visible'" );
 else
 {
 if( floatwnd == 0 || floatwnd.closed )
 floatwnd = window.open( "", "comment", "toolbars=0,width=600,height=200,resizable=1,scrollbars=1,dependent=1" );
 floatwnd.document.open( "text/html", "replace" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( "\r\n" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( WPtext );
 floatwnd.document.write( '
Close');
 floatwnd.document.write( "
" );
 floatwnd.document.close();
 floatwnd.focus();
 }
}

function WPHide( WPid )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'hidden'" );
}







NO. 07-08-0315-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

DECEMBER 30, 2009
______________________________

ANTHONY G. HEREFORD, JR., 

                                                                                                 Appellant

v.

THE STATE OF TEXAS, 

                                                                                                 Appellee
_________________________________

FROM THE 140TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2007-416,858; HON. JIM BOB DARNELL, PRESIDING
_______________________________

Opinion
_______________________________

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.
          Background
          One thousand-one, one thousand-two, one thousand-three, one thousand-four, one
thousand-five, one thousand-six, one thousand-seven, one thousand-eight, one thousand-nine, one thousand-ten, one thousand-eleven, one thousand-twelve, one thousand-thirteen, one thousand-fourteen, one thousand-fifteen, one thousand-sixteen, one
thousand-seventeen, one thousand-eighteen, one thousand-nineteen, one thousand-twenty. That was the amount of time Officer Arp initially tased Anthony G. Hereford, Jr.,
according to the instrument’s log. At the time, appellant was handcuffed and being held
down in a hospital emergency room. Arp wanted appellant to spit-out what he had in his
mouth. When appellant did not comply after Arp’s first foray, the tasings resumed. No one
viewed appellant as a threat to others during the episode. Nor had he attacked anyone. 
Arp simply wanted appellant to comply. When asked if “repeated taser use [was]
acceptable” and whether “20 seconds worth of tasering” was “okay,” the policeman
answered “yes” to both. 
          Arp was not the first to tase appellant, though. Officer Williams had already done
so twice at a locale miles away from the hospital. He too wanted appellant to remove the
items, which Williams thought to be drugs, from his mouth, and met with no success. So,
Williams decided to take appellant to the hospital in effort to gain medical assistance. 
          In continuing where Williams had failed, Arp said he administered all but one of the 
electrical shocks to Hereford’s inner thigh region; others saw them being administered to
appellant’s “groin area.”


 
          Finally, Arp reported seeing Officer Holmes, who also was present in the emergency
room, tase appellant at least once. Holmes denied this, though. So, by the time the
incident ended and within a span of about an hour, appellant was potentially shocked
eleven times. 
          Anthony G. Hereford, Jr. now appeals his conviction for possessing a controlled
substance with intent to deliver. Several issues before us involve the trial court’s decision
to deny appellant’s motion to suppress. Others involve the trial court’s refusal to permit
expert testimony on whether the acts undertaken by the officers were excessive and to
submit an article 38.23 instruction. Finding harmful error, we reverse the trial court’s
judgment. 
          Issue One – Warrants Not Admitted into Evidence
          Appellant initially contends that the trial court erred in overruling his motion to
suppress because the State failed to tender into evidence the arrest warrants upon which
Officer Williams acted. We overrule the contention.
          Next, appellant is quite correct in arguing that the State was obligated to tender the
arrest warrant and affidavit supporting its issuance into evidence when the arrest is based
upon a warrant. Paulea v. State, 278 S.W.3d 861, 864 (Tex. App.–Houston [14th Dist.]
2009, pet. ref’d). That was not done here. Nonetheless, Officer Williams testified at the
suppression hearing that about a week before the arrest he saw appellant driving his car
without a front license plate. Knowing this to be a traffic violation, see Tex. Transp. Code
Ann. §502.404(a) (Vernon Supp. 2009) (requiring a vehicle to carry a front license plate),
the officer directed appellant to pull over. Appellant allegedly said “no” and drove off. 
Because the officer was on bike patrol at the time, he could not give chase. Yet, the officer
concluded that appellant evaded arrest by driving away, and that portended the
commission of a criminal offense. Tex. Penal Code Ann. §38.04(a) (Vernon 2009) (stating
that a person commits an offense if he intentionally flees from a person he knows is a
peace officer attempting lawfully to arrest or detain him). This testimony is of import
because a peace officer may arrest someone without a warrant for any offense committed
in his presence or within his view. Tex. Code Crim. Proc. Ann. art. 14.01(b) (Vernon
2005). That the offense may have occurred sometime earlier does not affect the authority
granted under art. 14.01(b). Akins v. State, 202 S.W.3d 879, 889 (Tex. App.–Fort Worth
2006, pet. ref’d) (holding that an officer may make an arrest under art. 14.01(b) for a crime
committed at an earlier time); accord, Herrera v. State, No. 13-05-102-CR, 2006 Tex. App.
Lexis 10647 (Tex. App.–Corpus Christi, December 14, 2006, pet. ref’d) (not designated for
publication) (holding the same). Given this, we conclude that a reasonable officer
presented with the circumstances confronting Williams would have been justified in
arresting appellant at the motel despite the absence of a warrant. See Amador v. State,
275 S.W.3d 872, 878 (Tex. Crim. App. 2009) (holding that determining whether an officer
had probable cause to arrest is an objective test based upon the totality of the
circumstances). This, in turn, means that the trial court did not abuse its discretion in
concluding that appellant’s initial arrest was lawful even though the arrest warrants were
not offered into evidence.
          Issue Two – Reasonableness of the Search and Seizure
          Appellant next contends that the evidence of drugs upon which his conviction was
based should have been suppressed given the manner in which it was obtained. He
believed it to be unreasonable, excessive, and a violation of due process. The trial court
rejected the argument but why it did went unexplained. We sustain the issue.
          One need only harken back to first year constitutional and criminal procedure class
to recall our United States Supreme Court stating: “[i]t has long since ceased to be true
that due process of law is heedless of the means by which otherwise relevant and credible
evidence is obtained.” Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 210, 96
L.Ed.183 (1952). In Rochin, the police transported a suspect, who they thought swallowed
drugs, to the hospital to undergo the non-consensual pumping of his stomach. This was
done after their attempts to physically force Rochin to open his mouth met with no success. 
Id. 342 U.S. at 166, 72 S.Ct. at 206. According to the Court, recognizing the use of “brutal
conduct” as a legitimate means of securing evidence is tantamount to “afford[ing] brutality
the cloak of law.” Id. 342 U.S. at 173, 72 S.Ct. at 210. And, most importantly, it opted
against that by viewing the police conduct as a denial of due process. See Brown v. State
of Mississippi, 297 U.S. 278, 287, 56 S.Ct. 461, 465-66, 80 L.Ed. 682 (1936) (holding that
whipping or beating of a suspect to gain his confession violated due process).
          Years later, in Winston v. Lee, 470 U.S. 753, 755, 105 S.Ct. 1611, 1614, 84 L.Ed.2d
662 (1985), the Supreme Court was asked to consider whether more than due process is
implicated when evidence is secured through forceful means. It recognized that such
conduct may also run afoul of the Fourth Amendment to the United States Constitution. 
Whether it did depended upon the consideration of such indicia as whether the procedure
utilized by the police 1) threatened the suspect’s health or safety, 2) conformed to
accepted medical practices, 3) was performed by a trained professional, 4) arose from the
existence of probable cause to believe the suspect had evidence of a crime, 5) unduly
intruded upon the individual’s dignitary interests in personal privacy, and 6) was
commonplace of one to which individuals were often subjected. Id. 470 U.S. at 761-63,
105 S.Ct. at 1617-18. So too must the community’s interest in accurately determining
one’s guilt or innocence and the State’s need for the evidence be weighed. Id. 470 U.S.
at 762-67, 105 S.Ct. at 1617-20. Given that various indicia must be considered, there was
and is no bright line rule resolving all situations; instead, the courts are to resolve the
matter case by case. Id. 470 U.S. at 760, 105 S.Ct. at 1616. 
          We read the foregoing authority to require our public servants to comply with
particular standards of conduct and consciousness when performing their duties. Under
the umbrella of public servant walk policemen, and the standard applicable to their conduct
when gathering evidence of criminal activity is one of reasonableness. In other words, law
enforcement personnel must act reasonably when conducting searches and seizures. That
finds expression in the Fourth Amendment. Through it we are told that the “right of the
people to be secure in their persons, houses, papers and effects, against unreasonable
searches and seizures shall not be violated.” U.S. Const. amend. IV (emphasis added). 
This very concept is reiterated by the Court of Criminal Appeals decision in Hernandez v.
State, 548 S.W.2d 904 (Tex. Crim. App. 1977). When asked whether physical force could
be used to obtain evidence, it said yes but limited the measures utilized to “reasonable”
ones, which may include “reasonable physical contact.” Id. at 905. 
          But, should the acceptable standards of conduct be breached, then the judiciary
must intervene to remedy the violation. The corrective action available includes
suppressing the evidence obtained via the unacceptable procedure. Indeed, it was the
Supreme Court’s concern about an individual’s “freedom from all brutish means of coercing
evidence,” as well as the freedom from “state invasions of privacy” that eventually caused
it to apply the exclusionary rule to Fourth Amendment violations committed by state
authorities. Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961).
          One other preliminary matter bears comment. It involves the burden of proof and
the litigant responsible for carrying it. When an arrest or search is undertaken without a
warrant, the burden to show its legitimacy lies with the State. Amores v. State, 816 S.W.2d
407, 413 (Tex. Crim. App. 1991). As mentioned under issue one, the State failed to prove
that the arrest and search of appellant were undertaken per a valid warrant. Thus, it had
the burden to prove that the seizure by the officer at bar was reasonable. With that, we
turn to the record before us. 
          As previously mentioned, no one accused appellant of being violent or physically
aggressive towards anyone throughout the incident. Of the witnesses asked about it and
who were present, none said that they felt threatened by him.


 The record further
illustrates that though appellant would not voluntarily remove the items from his mouth, his
effort to keep his teeth clenched, his shaking his head, and his screaming and moaning



began after the officers endeavored to physically extract him from the squad car, applied
some throat hold on appellant, thrust him against the trunk of their police unit, tased him
on the back and leg, and eventually “pulled” him to the ground. This was done while
appellant’s hands remained cuffed behind his back. With regard to the aforementioned
throat hold, Officer Williams denied that it consisted of punching appellant. Rather, it
purportedly encompassed the application of “pressure points” which eventually converted
to “grabbing” appellant’s throat “pretty sternly,” according to the officer. 
          Realizing that their efforts were for naught and that appellant remained “non-compliant,” the policemen at the scene returned appellant to the back seat of the squad
car and began debating what to do next. When asked why they thought it permissible to
engage in this discussion and risk the attendant delay, Williams told the trial court that he
was “not totally convinced that [appellant] swallowed [the item] as much as he’s just
continuing to hold it in his mouth.”


 That very same officer also knew that crack cocaine
(i.e. the substance he believed appellant had) would not dissolve if simply kept in one’s
mouth. This testimony coupled with the fact that appellant continued to retain the drug in
his mouth after being pulled from the squad car, grabbed by the throat, “pulled” to the
ground and tased twice hardly suggests that he sought to swallow or otherwise destroy the
contraband.


 
          Once appellant arrived at the hospital, the tasing resumed. This was so despite the
method having achieved little success in the field. But rather than focus upon the locations
selected by Williams, Arp consciously opted for a “sensitive” one. That location, according
to Arp, was appellant’s upper, inner thigh, and there the tasing began anew. Yet, Williams
described seeing Arp apply the weapon to appellant’s “groin area” even though officers
purportedly were trained (by Williams and others) to avoid “the private areas.” What was
meant by the “private area” is unknown though Williams conceded that the areas which
officers were prohibited from tasing included the “groin.” Other than this, though, we have
nothing before us about the extent of the taser training generally received by the police or
policies adopted by the police department regarding taser use. So, the State effectively
failed to establish that the conduct of both Williams and Arp comported with accepted
practice. 
          Next, Williams described the tasing method applied here as “drive stun.”


 Being
drive stunned was “less violent” than being punched, kneed or struck with an asp, said the
officer. That nonetheless does not mean much. A bat may be “less violent” than a bullet,
yet both can cause grave injury or death. So, saying that the shock emitted from a taser
is “less violent” than being hit with a fist, struck with a knee, or beat with a steel baton fails
to allow one to reasonably gauge the actual amount of violence actually utilized. Indeed,
there may be situations wherein being tased is as egregious as being struck with a baton
depending upon the location of the blow. 
          That it may be “less violent” also falls short of illustrating that the measure has a
reduced likelihood of inflicting severe pain or injury. Indeed, Williams conceded that being
shocked with the weapon “doesn’t feel great” and that it inflicted pain, though the pain
stopped once the electrical charge ended.


 This may be why he agreed with defense
counsel’s characterization of tasers as “pain compliance” devices. And, though he opined
that “the taser alone has never actually killed anyone,” Williams acknowledged that not only
that it “may have been involved in an incident where an individual died,” but also that “there
is always a risk of death” when using it. Moreover, another witness, who happened to be
a physician present in the emergency room as Arp tased appellant, answered “yes” when
asked if he had heard of tasers “hurting anybody, killing anybody.” The same witness also
1) recalled that appellant would “scream” when tased, 2) opined that the procedure
“seemed painful,” and 3) related how appellant “was very frantic, because there was tasing
there in the ER . . . .” A nurse in attendance at the time also observed appellant’s screams
and appearance of being in pain when tased. That tasing via drive stun could also leave
scars and burns was also disclosed. And, while Williams may believe that the pain ends
once the electricity stops flowing, one may nonetheless suffer scars or burns thereafter.
Finally, logic would suggest that if the pain inflicted by the taser was as minimal as Williams
attempted to describe, the police department would not deem them very effective or useful. 
Yet, they are being readily used to effect, as illustrated here. 
          Additionally, that the weapon is known to inflict pain, is used for that purpose,
“always” involves the risk of death, and can burn flesh falls short of establishing it as a
nominal affront to human dignity and personal security. This is so even though it may be
“less violent” than a clubbing. Nor is it of much consequence that no one recalled specific
instances of a taser “actually” killing its victims. Far less is needed before a practice is
considered unreasonable. See, e.g. Dominguez v. Moore, 149 Fed. Appx. 281, 283, No.
04-41382, 2005 U.S. App. Lexis 21337 at *3 (5th Cir. 2005) (not designated for publication)
(holding that the refusal to loosen handcuffs constituted unreasonably excessive force
because plaintiff's hands became “grossly swollen” and resulted in permanent scarring and
nerve injury). 
          Also problematic is the manner in which the police at bar viewed use of the pain-
inflicting device. Those officers who were asked saw no problem with “continuously” or
“repeatedly” discharging a taser on individuals within their custody but who were “non-compliant.” Furthermore, non-compliance could include someone’s mere refusal to do that
asked of him, according to one officer. It was this very attitude that Arp exemplified in the
emergency room when shocking appellant either the four times to which he admitted or to
the eight times indicated by the taser’s log. He also was ready to continue if need be,
given his representations to appellant. It must be remembered that this representation and
accompanying conduct arose 1) after Williams found the taser ineffective and opted to try
something else and 2) while appellant was both handcuffed and held down. Whether this
comported with accepted departmental practice is unknown. Nonetheless, the lack of
concern about repeatedly tasing someone deemed “non-compliant,” coupled with the four
to eight tasings administered by Arp, the two by Williams, and the one which Arp accused
Holmes of administering evince a rather cavalier attitude towards the use of a weapon
known to inflict pain, cause burns, and “always” involves the risk of death. 
          Next, feeling the instantaneous sting of static electricity may be a common, everyday
happenstance. However, being subjected to 50,000 volts of electricity for twenty seconds
or more is not, and the State proffered no evidence suggesting otherwise. Simply put, the 
procedure before us is not one that is part of ordinary life like that in Schmerber v.
California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (the drawing of blood). 
Indeed, it is unlikely that more than most will ever experience it in these United States. 
          Regarding the matter of probable cause, appellant was under arrest when the
search and seizure began. Thus, the officers had the authority to search his person. See
McGee v. State, 105 S.W.3d 609, 615 (Tex Crim. App. 2003) (holding that a person may
be subjected to a search incident to his arrest). Furthermore, it is rather unquestionable
that State and its law enforcement representatives have an interest in securing and
preserving evidence of a crime. Id. Yet, the privilege to search and seize is not an
invitation for the officer to do whatever he chooses. Again, the conduct must be
reasonable. Hernandez v. State, supra. So there are limitations. 
          That the State and community have an interest in prosecuting individuals involved
in the drug trade is also beyond reasonable dispute. But here, appellant was already
subject to arrest and prosecution for other crimes. They included the crime of evading
arrest committed by appellant a week or so earlier or the crimes underlying the supposed
arrest warrants upon which Williams initially arrested appellant. And, though securing the
drugs from appellant was needed to prosecute the crime at bar, the State failed to illustrate
that their loss or destruction was imminent or even probable. Again, no one questions that
appellant had already held the substances in his hand and mouth for some time before
they were forcibly removed. He did this even though previously having his throat “sternly”
grabbed, being thrown to the ground, being tased in the field, and being held down and
tased multiple times in the hospital. Had appellant intended to swallow, dispose, or destroy
the drugs, common sense suggests that he would have done so rather than risk the effects
of physical force. 
          More importantly, no evidence of record suggested, much less illustrated, that the
drugs appellant clutched in his hand were imminently subject to being swallowed or lost. 
So too should it be mentioned that Officer Williams had already decided against further
tasing and opted to seek medical help instead. Though the record indicates that some
effort was undertaken by medical personnel to have appellant expel the drugs (i.e. forcing
implements into his mouth and exposing him to ammonia capsules), the State did little to
negate the chance that other reasonable but less painful medical options were available.
          Of course, it is easy to say that the weapon ultimately proved effective. So too
would a cane and club be effective if used enough times. The problem, however, is that
our United States Supreme Court condemned beatings and whippings as a means of
obtaining evidence. Brown v. State of Mississippi, 297 U.S. at 285-86, 56 S.Ct. at 465.
Given that those measures and the application of a taser are founded upon the concept
of compliance through pain and the rather accurate premise that the more inflicted the
greater the chance of compliance, it would be reasonable to view two modes of obtaining
evidence as alike. Additionally, both can be quite brutal depending upon the manner of
and circumstances surrounding their application.
          Had the conduct before us encompassed only Williams’ initial application of a hold
upon appellant’s throat then the debate would be less complicated. This is so because
authority recognizes that the administration of a choke hold may be reasonable to prevent
one from swallowing evidence. Hernandez v. State, supra; Lewis v. State, 56 S.W.3d 626,
628-29 (Tex. App.–Texarkana 2001, no pet.). Moreover, at least one court thought tasing
a suspect several times immediately after arrest was non-excessive when he had tried to
escape, had lunged at the officers, had actually began chewing and swallowing the drugs
hidden in his mouth, and physically resisted the officers’ efforts to have him spit out the
substance. Ellis v. Columbus City Police Dep’t., No. 1:07CV124-A-A, 2009 U.S. Dist. 
Lexis 95821 (N.D. Miss. September 15, 2009). Yet, we had more here. Admittedly, the
situation at bar would liken to Ellis had Williams alone tased appellant. But, Arp joined in
long after the arrest. Furthermore, our situation involved a controlled hospital environment
whereat trained medical personnel stood ready to help if appellant swallowed the drugs. 
That was missing in Ellis for the officers were in the field and actually saw appellant begin
to swallow the drugs. There they had little choice but to react. Nor do we have before us
an individual who attempted to escape or tried to assault the officers, as in Ellis. Also
missing from that case is evidence that the officers intentionally selected the rather
sensitive “groin area” as their target of choice and administered possibly eleven tasings.
          The absence of evidence regarding the extent of taser training, if any, completed
by those given tasers at bar, the police department’s policy, if any, regulating the use of
tasers, whether the conduct of Williams and Arp comported with both their alleged training
and department policies hinders our ability to assess the reasonableness of force in
question. Whether any other authoritative organization or body implemented guidelines
or policies regulating the use of tasers would and whether the conduct of the police at bar
complied with them also would have been helpful in determining what a reasonable officer
facing the same circumstances presented to Williams and Arp would have done. The
extent of Arp’s role at the hospital was also pertinent. Did his duty encompass the ability
to intervene in medical situations or was he simply there to protect medical personnel from
aggressive patients? The answer to those questions could be influential especially since
the record clearly illustrates that appellant was not a threat to third parties. Whether Arp
was invited by medical personnel to assist or whether he simply interjected himself without
affording them adequate opportunity to explore alternatives was also undeveloped. While
the medical care initially given appellant proved ineffective that does not mean they had
no other reasonable medical options available before Arp resorted to the taser. 
          Our application of the record to the indicia itemized in Winston and policy
considerations mentioned in Brown, Rochin, and Mapp leads us to conclude that the State
failed to prove that force administered here was reasonable. See United States v.
Degollado, 696 F. Supp. 1136, 1140-41 (S.D. Tex. 1988) (wherein the court stated that
securing evidence through the use of an electrical prod and seltzer water warranted its
suppression); see also Bultema v. Benzie County, 146 Fed. Appx. 28, 35, No. 04-1772,
2005 U.S. App. Lexis 17818 at *16 (6th Cir. 2005) (holding that “the gratuitous use of force
on a suspect who has already been subdued and placed in handcuffs is unconstitutional);
Champion v. Outlook Nashville, Inc., 380 F.3d 893, 900-01 (6th Cir. 2004) (holding that “it
was excessive for police officers to lay on top of a mentally retarded individual who had
stopped resisting arrest and posed no flight risk, and spray him with pepper spray even
after he was immobilized by handcuffs and a hobbling device”). The trial court erred in
holding otherwise.


 We further deem the error harmful. That is, we cannot say beyond
reasonable doubt that the evidence secured through the police conduct had no effect on
the outcome. See Tex. R. App. P. 44.2(a) (requiring reversal unless the court determines
beyond a reasonable doubt that the error did not contribute to the conviction or
punishment). 
          Though other issues were presented by appellant, their resolution is unnecessary
to the disposition of this appeal. Since the cause will be remanded, they can be raised and
resolved by the trial court anew. Accordingly, we reverse the judgment entered below and
remand the cause.
 
                                                                           Brian Quinn
                                                                          Chief Justice

Publish.


Campbell, J., concurs in result.